UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA
FOR THE USE AND BENEFIT OF
C.E.I., INC., dba
COMMERCIAL ELECTRIC, INC.
Plaintiff

CA 04 263 T

v.

C.A. No. 04-

R.W. GRANGER & SONS, INC. and
ST. PAUL FIRE AND MARINE
INSURANCE COMPANY
Defendants

**COMPLAINT**

**JURISDICTION AND VENUE**

1. Plaintiff C.E.I., INC, dba Commercial Electric, Inc. invokes this Honorable Court's federal question jurisdiction to secure the rights guaranteed by the Miller Act, 40 U.S.C. § 3131, et seq., and to secure the payments guaranteed by the Miller Act Payment Bond attached hereto as Exhibit 1.

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367, 2201 and 2202 and 40 U.S.C. § 3133b.

3. The actions complained of herein occurred in Rhode Island and venue is proper in this Court pursuant to 40 U.S.C. § 3133(b)(3) and 28 U.S.C. § 1391(b)(2) and (c).

PARTIES

4. Plaintiff C.E.I., Inc., dba Commercial Electric, Inc. ("Plaintiff"), a Rhode Island corporation engaged in the construction industry as an electrical contractor, is a "person" within the meaning of 40 U.S.C. § 3133, that furnished labor and materials on a federal construction contract awarded by the Rhode Island Air Nation Guard for the construction of the C130J Maintenance Hangar & Shops at Quonset Point, North Kingstown, RI, Contract No. DAHA37-02-C-001 ("the Miller Act Construction Contract") to Defendant General Contractor R.W. Granger & Sons, Inc. ("General Contractor Granger") pursuant to a subcontract agreement between Plaintiff and Defendant General Contractor Granger.

5. Defendant General Contractor R.W. Granger & Sons, Inc. ("Defendant General Contractor Granger") is or was a general contractor engaged in the construction industry as a general contractor in the stream of interstate commerce.

6. Defendant St. Paul Fire and Marine Insurance Company

("Defendant Bonding Company") issued the requisite Miller Act Payment Bond (attached hereto as Exhibit 1) regarding the Miller Act Construction Contract on which Plaintiff furnished labor and materials to Defendant General Contractor Granger Enterprises, L.L.C. ("Defendant General Contractor Granger").

**COUNT I**
BREACH OF CONTRACT

7. Plaintiff herein realleges each and every other allegation set forth in this complaint.

8. Pursuant to a subcontract agreement between Plaintiff and Defendant General Contractor Granger, Plaintiff supplied the requisite labor and materials satisfactorily and without complaint.

9. Despite repeated demands for payment, Defendant General Contractor Granger has failed or is unable to pay Plaintiff the $866,817.70 balance due under its subcontract for labor and materials that Plaintiff furnished to and on behalf of Defendant General Contractor Granger in prosecution of the work required by the Miller Act Construction Contract between Defendant General Contractor Granger and the Rhode Island Air Nation Guard for which the General Contractor Granger purchased and posted the requisite Miller Act Payment Bond (attached hereto as Exhibit 1).

10. Defendant General Contractor Granger's nonpayment of the $866,817.70 subcontract balance due Plaintiff is established by Plaintiff's letter to Defendant General Contractor Granger dated June 8, 2004 attached hereto as Plaintiff's Exhibit 2 and by Plaintiff's letter to Defendant General Contractor Granger dated June 15, 2004 attached hereto as Plaintiff's Exhibit 3.

11. The Miller Act Payment Bond (attached hereto as Exhibit 1) secures payment to Plaintiff for the $866,817.70 unpaid subcontract balance, plus interest, attorney's fees and court costs based upon Defendant General Contractor Granger's nonpayment of the $866,817.70 subcontract balance due Plaintiff for the labor and materials that Plaintiff furnished to and on behalf of Defendant General Contractor Granger in the prosecution of the work required by the Miller Act Construction Contract.

12. Neither Defendant General Contractor Granger nor Defendant Bonding Company have a justifiable defense to the Plaintiff's payment claims and Defendant General Contractor Granger and Defendant Bonding Company stand jointly and severally liable to Plaintiff for attorneys' fees pursuant to R.I.G.L. § 9-1-45.

13. The within Complaint is filed as a provisional remedy and does not constitute a waiver of any rights of mediation or arbitration.

WHEREFORE, Plaintiff demands judgment jointly and severally against Defendants in an amount not less than the $866,817.70 unpaid subcontract balance, plus interest, attorney's fees and the taxable costs of this action.

**COUNT II**
MILLER ACT PAYMENT BOND INDEBTEDNESS

14. Plaintiff herein realleges each and every other allegation set forth in this complaint.

15. Plaintiff stands entitled to collect from Defendant Bonding Company against the Miller Act Payment Bond that General Contractor Granger purchased from Defendant Bonding Company regarding performance of the Miller Act Construction Contract the $866,817.70 unpaid subcontract balance, plus interest, attorney's fees and court costs owed to Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendant Bonding Company in an amount not less than the $866,817.70 unpaid subcontract balance, plus interest, attorney's fees and the taxable costs of this action.

**COUNT III**
QUANTUM MERUIT

16. Plaintiff herein realleges each and every other allegation set forth in this complaint.

17. Plaintiff stands entitled to collect from Defendants not less than the $866,817.70 unpaid subcontract balance, plus interest, attorney's fees and the taxable costs of this action based upon Plaintiff's delivery of all required labor and materials needed for the completion of all contract requirements as required by the subcontract between Plaintiff and Defendant General Contractor Granger.

WHEREFORE, Plaintiff demands judgment jointly and severally against Defendants in an amount not less than the $866,817.70 unpaid subcontract balance, plus interest, attorney's fees and the taxable costs of this action.

**COUNT IV**
**UNJUST ENRICHMENT**

18. Plaintiff herein realleges each and every other allegation set forth in this complaint.

19. By virtue of Defendant General Contractor Granger's receipt of the full value of Plaintiff's delivery of all required labor and materials needed for the completion of all contract requirements as required by the subcontract between Plaintiff and

Defendant General Contractor Granger, Defendant General Contractor Granger has been unjustly enriched by failing or refusing to deliver final payment to Plaintiff in amount not less than the $866,817.70 unpaid subcontract balance, plus interest, attorney's fees and the taxable costs of this action.

20. As a direct and proximate result of the facts alleged herein, the Defendant General Contractor Granger, Defendant General Contractor Granger has been unjustly enriched at Plaintiff's expense.

WHEREFORE, Plaintiff demands judgment jointly and severally against Defendants in an amount not less than the $866,817.70 unpaid subcontract balance, plus interest, attorney's fees and the taxable costs of this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Honorable Court grant the following relief:

1. A finding that Defendants stand jointly and severally liable to Plaintiff in an amount not less than the $866,817.70 unpaid subcontract balance, plus interest, attorney's fees and the taxable costs of this action;

2. An appropriate award of pre-judgment interest on all sums recovered;

3. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

PLAINTIFF COMMERCIAL ELECTRIC

By its Attorneys,

CHARLES S. KIRWAN & ASSOCIATES

Charles S. Kirwan (Bar #4050)
36 Park Place
Pawtucket, RI 02860
(401) 722-2500
(401) 727-1256 (fax)

TRIAL BY JURY IS HEREBY DEMANDED FOR ALL ISSUES SO TRIABLE.

Charles S. Kirwan

| PAYMENT BOND (See instructions on Page 2) Bond No. SR1482 | DATE BOND EXECUTED (Must be same or later than date of contract) April 18, 2002 | FORM APPROVED OMB NO. 9000-0045 |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (VRS), Office of Federal Acquisition Policy, GSA, Washington, D.C. 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0045), Washington, D.C. 20503.

02 APR 24 PM 3:57

PURCHASING DIV. RECEIVED

| PRINCIPAL (Legal name and business address) | TYPE OF ORGANIZATION ("X" ONE) | | | |
|---|---|---|---|---|
| R.W. GRANGER & SONS, INC.<br>415 Boston Turnpike<br>Shrewsbury, MA 01545 | ☐ INDIVIDUAL<br>☐ JOINT VENTURE | | ☐ PARTNERSHIP<br>☒ CORPORATION | |
| | STATE OF INCORPORATION<br>Massachusetts | | | |
| SURETY(IES) (Name(s) and business(es) address) | PENAL SUM OF BOND | | | |
| ST. PAUL FIRE AND MARINE INSURANCE COMPANY<br>385 Washington Street<br>St. Paul, MN 55102 | MILLION(S)<br>13 | THOUSAND(S)<br>457 | HUNDRED(S)<br>000 | CENTS<br>00 |
| | CONTRACT DATE<br>April 5, 2002 | | CONTRACT NO.<br>DAHA37-02-C-0001 | |

OBLIGATION:

We, the Principal and Surety(ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

CONDITIONS:

The above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal furnishing labor, material or both in the prosecution of the work provided for in the contract identified above, and any authorized modifications of the contract that subsequently are made. Notice of those modifications to the Surety(ies) are waived.

WITNESS:

The Principal and Surety(ies) executed this payment bond and affixed their seals on the above date.

**PRINCIPAL** — R.W. GRANGER & SONS, INC.

| | 1. | 2. | 3. | |
|---|---|---|---|---|
| Signature(s) | [signature] (Seal) | (Seal) | (Seal) | CORPORATE SEAL |
| Name(s) & Title(s) (Typed) | Max E. [illegible]<br>Vice President | | | |

**INDIVIDUAL SURETY(IES)**

| | 1. | 2. |
|---|---|---|
| Signature(s) | (Seal) | (Seal) |
| Name(s) (Typed) | | |

**CORPORATE SURETY(IES)**

| SURETY A | | | | |
|---|---|---|---|---|
| Name & Address | ST. PAUL FIRE AND MARINE INSURANCE COMPANY<br>St. Paul, Minnesota | STATE OF INC.<br>MN | LIABILITY LIMIT<br>$ | CORPORATE SEAL |
| Signature(s) | 1. [signature] | 2. | | |
| Name(s) & Title(s) (Typed) | 1. Kathleen M. Flanagan<br>Attorney-in-Fact | 2. | | |



**Plaintiff's Exhibit 1**

Commercial Electric, Inc.

491 Waterman Avenue
East Providence, Rhode Island 02914

Phone 401 438-0707
Fax 401 438-0709

June 8, 2004

VIA TELECOPIER (508-845-1094)
AND FEDERAL EXPRESS OVERNIGHT DELIVERY

Mr. Ernest O'Brien, President
Mr. Max Jordan, Vice President
R.W. GRANGER & SONS, INC.
415 Boston Turnpike
Shrewsbury, MA 01545

Re: C130 J Maintenance Hanger and Shops, North Kingstown, Rhode Island
R.W. Granger & Sons, Inc.
Rhode Island Air National Guard Contract No. DAHA37-02-C-001

SUPPLEMENTAL CLAIM FOR SUBCONTRACT DELAY DAMAGES

Dear Messrs. O'Brien and Jordan:

Pursuant to Subcontract Article 5.3 this supplemental claim for delay damages further substantiates and specifically quantifies the undisputed delay claims that Commercial Electric, Inc. ("CEI") asserted against R.W. Granger & Sons, Inc. ("Granger") in our letters to Granger dated February 6, 2003, March 3, 2003 and July 28, 2003 with respect to the delays and increased costs of performance that CEI suffered on our Subcontract solely due to Granger's prolonged and willful delays and project management failures regarding Granger's prime federal contract with the Rhode Island Air National Guard ("RIANG") on Contract No.DAHA37-02-C-001, requiring construction of the C130 J Maintenance Hanger and Shops in North Kingstown, Rhode Island ("the Project").

The well-documented record on this Project prevents Granger from disputing any of the following controlling facts that entitle CEI to each category of damages specified herein:

1. Neither Granger nor RIANG ever once faulted any aspect of the timeliness or workmanlike character of CEI's work or CEI's diligent cooperation on this very troubled and unreasonably delayed Project.

2. CEI fully and timely completed every element of our contracted-for scope of work ("the Work"),

**Plaintiff's Exhibit 2**

without fault, delay, complaint or any deficiency.

3. The Granger-CEI "time is of the essence" Subcontract (see AIA Subcontract Article 9.4), CEI's schedule of values as approved by Granger (see AIA Subcontract Article 4.1.3), and the CPM schedules that Granger provided to RIANG and CEI all prove that Granger promised CEI a Subcontract substantial completion date of not later than June 1, 2003 (see AIA Subcontract Article 9.3). All Subcontract and other Project documents fully confirm that Granger did not restrict CEI's contract right to earlier completion of CEI's scope of work (see AIA Subcontract Article 9). All Subcontract and other Project documents fully confirm that Granger stands liable to CEI for 360 days of Granger-caused delay at the fixed per diem liquidated damages rate of $830.00 as the per diem for delaying completion of CEI's scope of work after the substantial completion date of June 1, 2003 ("Substantial Completion") (see AIA Subcontract Article 9.3) until May 26, 2004.

**4.** Solely due to Granger's negligent Project management and negligent subcontractor selection errors, omissions and failures, as well as Granger's knowing, intentional, purposeful and prolonged refusal to secure, retain, manage and coordinate qualified subcontractors to complete necessary unchanged critical path work including, inter alia, steel erection work activities and to complete necessary unchanged critical path concrete work activities (hereinafter, "Granger's purposeful refusal to cure its Project management and subcontractor selection, retention and replacement breaches"), Granger stands liable to CEI for knowingly and purposefully preventing CEI's achievement of the contracted-for June 1, 2003 Substantial Completion date for Project completion (see AIA Subcontract Article 9.3). Granger's knowing and deliberate delay unreasonably and unnecessarily extended CEI's performance period for almost a full year, from June 1, 2003 until May 26, 2004. CEI notes that while we will currently use the May 26, 2004 Substantial Completion date as the approximate end point for the purposes of computing our current delay damage claims, because CEI's working forces continue to work to complete our initial scope of work on the Project, CEI expressly reserves the right to claim all on-going or additional delay damages accruing after May 26, 2004 until we finally complete our delayed scope of work.

5. CEI delayed none of its scope of work, and while CEI delayed no portion of any other aspect the Project. CEI is completely without any fault or liability for any portion of the year-long delay on this Project. Granger stands solely liable to CEI for all delay damages and increased costs of CEI's performance of its Subcontract scope of work.

6. Granger's Project coordination failures and Granger's Project management failures, most critically the negligent selection and retention of the steel erection and concrete subcontractors delayed all work on the Project's critical path, barred normal Project progress and extended the time for CEI's Subcontract performance from not less than 391 days (05/07/02 - 06/01/03) to not less than 751 days (05/07/02 - 05/26/04).

7. Granger never disputed, and indeed has always remained unable as a matter of undisputed fact to contest, deny or object to any of the delay claim notices and reservation of delay claim rights that CEI timely provided to Granger by CEI's letters to Granger dated February 6, 2003, March 3, 2003 and July 28, 2003. Indeed, in Granger's March 21, 2003 and July 29 2003 responses to the listed CEI delay claim notice letters, Granger fatally admits its failed efforts to keep the Project on schedule and fatally admits Granger's unfulfilled responsibility to manage the Project. To reply to CEI's delay claims, Granger raises only one completely futile excuse based on alleged bad weather. Granger's complaints

about bad winter weather are completely meaningless because CEI's Subcontract work was delayed by wholly incomplete predecessor work activities on the Project critical path that Granger should have and could have been completed long before any predictable New England winter weather conditions were encountered. Whether or not RIANG allowed Granger some measure of mercy by unilaterally granting a non-compensable time extension based upon winter weather does not excuse or limit Granger's sole and direct liability to CEI for all the delays caused by Granger before winter's arrival, even if that on-going delay extended throughout the first winter on the Project on through the second winter of the Project. But for Granger-caused delays, all of CEI's work could have and would have been completed regardless of any alleged adverse weather conditions. Weather caused no significant, if any, critical path delay on this Project that Granger completely mismanaged It may have snowed on Granger's delayed Project, but snow never delay Granger unreasonably protracted and delayed Project.

8. The core work activities constituting the majority of the core critical work activities included in CEI's Subcontract scope of work were originally scheduled for timely, economical and efficient completion by CEI, as approved by Granger and RIANG, during the bargained-for time period extending from November 2002 to February 2003. Solely due to the prolonged and knowing failure of Granger to select and retain competent steel erection and concrete subcontractors, Granger's knowing and deliberate failure to cure Granger's obvious and well-documented abandonment of normal Project management functions and responsibilities, and Granger's other Project management and Project coordination failures, CEI was wrongfully denied CEI's bargained-for right to complete CEI's scope of work on this Granger-CEI "time is of the essence" Subcontract (see AIA Subcontract Article 9.4) in a timely, economical and efficient manner.

9. CEI, by letter dated February 6, 2003, asserted CEI's claim for all resulting delay damages noting the specific delays that Granger had imposed upon all of CEI's critical path work activities. Granger did not dispute and has never disputed, and as matter of undisputed Project records cannot dispute, the fact that Granger-caused delays barred and precluded CEI's timely, efficient and cost-effective completion of the following activities, all originally scheduled, as approved by Granger and RIANG, for completion by CEI between November 2002 and February 2003:

| ACTIVITY | SCHEDULED COMPLETION |
|---|---|
| Power ductbanks | Nov |
| Communication ductbanks | Nov |
| WEST SIDE: | |
| Rough in walls | Nov/Dec |
| Set gear | Dec/Jan |
| Install raceways & pull wire | Dec/Jan |
| Hang light fixtures | Jan |
| Install wiring devices | Feb |
| Install lights in grid ceiling | Feb |
| PUMP HOUSE: | |
| Rough in walls | Dec |
| Install Gear | Jan/Feb |
| Install raceways & pull wire | Jan/Feb |

Hang light fixtures Jan/Feb

10. The Project delay problems that CEI protested in CEI's letter to Granger dated February 6, 2003 are fully confirmed by RIANG in Project Meeting Minutes prepared by Granger, that record and admit significant Granger-caused delays regarding critical path construction activities that Granger had to complete before CEI could commence the Work. See e.g. March 6, 2003 Granger Meeting Minutes # 00036, item #00124; March 26, 2003 Granger Meeting Minutes #00102, item # 00124. The "two week look ahead schedule" attached to the March 26, 2003 Granger Meeting Minutes reported that structural steel in the West Side had not yet been erected and the rebar and wall bracings had not yet been installed. Furthermore, there were significant Granger-caused problems with the critical path concrete slab work activities. The slab south of the 6-line, East Side was poured incorrectly. RIANG timely requested a review of the slab's flatness on January 8, 2003 and it was determined that Granger was required to repair the slab. See January 8, 2003 Granger Meeting Minutes, # 00029, item #00105. "The last of the major building slabs" was not placed until May 21, 2003. May 21, 2003 Granger Meeting Minutes #00047, item #00105. On May 14, 2003, RIANG expressed concern about more defective elements of Granger's critical path work in this instance the defective critical path concrete work involved depressions in the slab in the main hanger. See May 14, 2003 Granger Meeting Minutes, # 00046, item #00105. Again, Granger recklessly and intentionally delayed corrective work on the slabs that RIANG reasonably required. See June 4, 2003 Granger Meeting Minutes #00048, item #00105. True to form, Granger recklessly and intentionally delayed the required corrective work from not later than mid-May 2003 until September 24, 2003. See Granger Meeting Minutes #00064, item # 00105.

11. Because Granger secretly decided to abandon normal Project management functions, and because Granger made no cognizable effort to manage, control or coordinate the Project, Granger could not dispute, did not dispute, and has never disputed, CEI's delay claim letter dated February 6, 2003. As a matter of undisputed fact, Granger conclusively accepted all facts and claims asserted in CEI's delay claim letter dated February 6, 2003 and never contested, protested or objected to any delay claims identified by CEI.

12. CEI, by letter to Granger dated March 3, 2003, further described and supplemented CEI's delay claims against Granger for all resulting Project delay damages, noting that, as a follow-up to CEI's delay claim letter dated February 6, 2003 that: "Approximately a month has past and we are still waiting for a response. The situation seems to worsen with each passing week. Please review the original [CEI February 6, 2003 delay claim] correspondence attached and provide feedback as soon as possible."

13. Because Granger had secretly decided to abandon normal Project management functions, and because Granger made no cognizable effort to manage, control or coordinate the Project, Granger could not dispute, did not dispute, and has never disputed CEI's delay claim letters dated February 6, 2003 and March 28, 2003. As a matter of undisputed fact, Granger has conclusively accepted all facts and claims asserted in CEI's delay claim letters dated February 6, 2003 and never contested, protested or objected to any delay claims identified by CEI, except to raise meaningless winter condition complaints in Granger's letter dated March 11, 2003.

14. CEI, by letter to Granger dated July 28, 2003, further described and amplified CEI's on-going claim against Granger for the prolonged and accruing Project delay damages that Granger continued to impose purposefully and unnecessarily upon CEI. CEI's letter to Granger dated July 28, 2003

specifically identified the obvious critical path delays that Granger knowingly and purposefully refused to correct. Granger has never disputed, and as matter of undisputed Project records cannot dispute the fact that Granger-caused delays barred and precluded CEI's timely, efficient and cost-effective completion of CEI's Work. Indeed, Granger's reply letter dated July 29, 2003 admits Granger's liability for all Project delays identified by CEI. True to Granger's non-managing role of a "passive bystander" on this Project, Granger's reply letter dated July 29, 2003 passively admits Granger's agreement with CEI's delay claim complaints: "We [Granger] all have the same concerns regarding the status of the building with regard to [Granger's prolonged failure to achieve] weather-tightness, and the impact that has on the overall schedule." On this record, this amounts to Granger's guilty plea regarding all Project critical path delays suffered by CEI. Granger-caused delays barred and precluded CEI's timely, efficient and cost-effective completion of the following activities, all originally scheduled, as approved by Granger and RIANG, for completion by CEI between November 2002 and February 2003. As confirmed by CEI's fact specific Project delay protest letter to Granger dated July 28, 2003, the extended critical path delays imposed upon the Project due to Granger's knowing and purposeful abandonment of normal Project management functions were outrageous and permit Granger no defense, no argument and no quibbling about any category of CEI's resulting delay damages:

1. The building is not weather tight therefore preventing completion of installation of the interiors and the terminations of the panel boards. It is also stopping the installation of disconnect switches and transformer connections throughout the main building and the pump house.

2. The metal linear panels are not installed in the high bay area. These panels must be installed prior to the installation of our conduits.

3. We are also experiencing rust in a number of raceways. This is also directly related to issue #1 above.

4. The hanger steel structure is not complete in some areas, which has caused us to relocate numerous conduit runs due to the interference of the support system being installed after our conduit installation.

5. Gypsum board is not completed on 1st floor West that is preventing the installation of our conduit system, and the telecommunications wiring.

15. Because Granger secretly decided to abandon normal Project management functions, and because Granger made no cognizable effort to manage, control or coordinate the Project, Granger could not dispute, did not dispute, and has never disputed, any aspect of CEI's supplemental delay claim letter dated July 28, 2003. As a matter of undisputed fact, Granger's reply letter dated July 29, 2003 conclusively admitted and accepted all facts and claims asserted in CEI's supplemental delay claim letter dated July 28, 2003 and at all times since Granger has never contested, protested or objected to any of the delay claims raised and identified by CEI.

16. On July 30, 2003, RIANG indicated that Granger was delaying and taking too long to make repair and undertake corrective work. RIANG directed Granger to make an exerted effort to have get identified Project work deficiencies and omissions corrected in a more timely manner. See July 30, 2003 Granger Meeting Minutes # 00056, item # 00175.

17. Because Granger secretly decided to abandon normal Project management functions, and because Granger decided to withhold making the required investments of time, effort and resources necessary to manage, control and coordinate the Project, Granger knowingly and purposefully refused to correct or address in a normal, honest and commercially reasonable manner any of the Project delay problems identified in CEI's delay claim letters dated February 6, 2003, March 3, 2003 and July 28, 2003. Solely due to Granger's knowing and purposeful abandonment of normal Project management functions, the critical path delays identified by CEI's delay claim letters were unnecessarily prolonged for almost a full year after the June 1, 2003 scheduled date for Project Substantial Completion See Granger's February 2004 CPM ("Granger CPM"); Granger's February 2004 Schedule ("Granger Schedule"). Granger's purposeful Project delays prevented CEI from pulling wire in the West Side until February 2004. See Granger CPM.. Granger's purposeful Project delays prevented CEI from hanging light fixtures in the West Side until February 2004. See Granger Schedule. Granger's purposeful Project delays prevented CEI from installing lights in the grid ceiling of the West Side until February 2004. See Granger CPM. Granger's purposeful Project delays prevented CEI from completing the installation of the linear panels any time sooner than March 2004. See Granger Schedule. Solely due to Granger's purposeful Project delays, Granger's incompetent working forces did not close in the roof at Stair #1 and the Pump House until December 2003, unnecessarily forcing CEI's working forces to work in adverse, inefficient, wet and rusty conditions. See December 17, 2003 Granger Meeting Minutes #00076, item # 00124; December 23, 2003 Granger Meeting Minutes # 00077, item #00124. Likewise, solely due to Granger's purposeful Project delays, Granger's incompetent working forcing did not close in the roof of the hanger until February 2004, unnecessarily forcing CEI's working forces to work in adverse, inefficient, wet and rusty conditions. See Granger CPM.

18. Granger's purposeful Project delays were the sole cause of the Project delays that prevented CEI from staring work on permanent power until October 2003. See October 15, 2003 Granger Meeting Minutes #00067, item # 00124.

19. The unnecessarily prolonged delays to Project critical path work activities knowingly and recklessly caused by Granger's willful failure to exercise any reasonable level of effort to select, supervise and replace essential concrete and steel erection trade subcontractors is clearly evidenced by Granger's own Meeting Minutes that fatally and conclusively admit that the settle erection subcontractor, "Tri-state is behind schedule," October 17, 2003 Granger Meeting Minutes #00103, item #00015, and Tri-state "demobilized from the job site and appears to be going bankrupt," see October 22, 2003 Granger Meeting Minutes #00068, item # 00124. "Granger anticipates a month lost on the critical path due to loss of Tri-state." See October 29, 2003 Granger Meeting Minutes # 00069, item # 00124. One month later, Granger recklessly rehired Davis Erectors to replace Tri-State continuing Granger's consistent failure to make honest, adequate and timely efforts to complete critical path roofing work activities. See November 26, 2003 Granger Meeting Minutes #00073, item #00124. In the end, due to Granger's secret decision to abandon normal Project management functions, Granger's working forces did not complete the roof at Stair #1 until December 11, 2003. See December 17, 2003 Granger Meeting Minutes #00076, item # 00124. Likewise, not until December 23, 2003, did Granger finally and belatedly complete the Pump House roof. See December 23, 2003 Granger Meeting Minutes # 00077, item #00124.

20. Granger alone drafted the Parties' Subcontract. That Subcontract does not bar or even restrict CEI's right to early completion of CEI's bargained-for "time is of the essence" scope of work nor does the Parties' "time is of the essence" Subcontract bar or restrict CEI's right to early completion delay

damages (see AIA Subcontract Article 9). At all times relevant to this Subcontract, CEI retained full Subcontract discretion and full Subcontract authority to finish early or to rely on this built-in additional float time to protect against any future unforeseen difficulties that might possibly cause CEI to take all time permitted through the bargained-for June 1, 2003 date for Project Substantial Completion. On any job the float is an expiring resource, and on this job, Granger's radical unilateral imposition of prolonged delays to virtually all critical path work activities materially breached the parties "time is of the essence" Subcontract and quickly, unproductively and unnecessarily consumed all available float time, for which Granger now stands liable to CEI for all resulting losses and inefficiencies.

21. CEI's diligent and workmanlike completion of the limited portions of the work that did become available affirmatively proves that CEI would have completed this Project long before the initially planned June 1, 2003 date of Substantial Completion, but for Granger's purposeful refusal to cure its Project management and subcontractor selection, retention and replacement breaches. Indeed, in light of the Granger-repudiated Project CPM Schedules, in light of the specific Project management complaints directed to Granger in CEI's February 6, 2003, March 3, 2003 and July 28, 2003 delay claim complaint letters regarding the Granger-imposed delays to CEI's core critical work activities, and in light of CEI's diligent and workmanlike completion of the limited portions of the work that did become available, Granger cannot dispute the fact that CEI would have completed this Project long before the initially planned June 1, 2003 date of Substantial Completion. Only Granger's knowing and reckless Project management abdication prevented CEI from achieving its own Subcontract completion months earlier than June 1, 2003.

22. Because Granger secretly decided to abandon normal Project management functions, and based upon Granger's purposeful and undisputed refusal to cure its Project management and subcontractor selection, retention and replacement breaches, now Granger has no legitimate option and must make expedited payment of all categories of CEI's project damages. While CEI is not waiving its right to early completion delay damages, CEI makes no separate claim for early completion delay damages in order to expedite prompt final payment on this Project. If Granger or its bonding company elects to force protracted dispute resolution proceedings, Granger and its bonding company are hereby notified that CEI claims additional damages, as early completion delay damages in an amount equal to the amounts incurred by CEI with respect to CEI's final twenty-five (25) working days on this "time is of the essence" Subcontract.

## A. GRANGER CANNOT DISPUTE ITS PLAIN SUBCONTRACT LIABILITY TO CEI

CEI's entitlement to delay damages and increased performance costs is clear and its delay damages are substantial. CEI now stands entitled to constructive change and delay damages for being denied normal access to timely complete CEI's bargaining-for "time is of the essence" Subcontract scope of work in violation of the parties' Subcontract, CEI's approved schedule of values and the RIANG approved Project CPM schedules.

A constructive change occurs when a subcontractor, such as CEI, performs work beyond subcontract requirements or without fault incurs increased costs of performance, without a formal order under the changes clause, either by an informal order of the General Contractor or by fault of the General Contractor. Youngdale & Sons Constr. Co. v. U.S., 27 Fed.Cl. 516, 539 (1993). A constructive change entails two base components, the change component and the order or fault component. Al Johnson Constr.

Co. v. U.S., 20 Cl.Ct. 184, 20┐ (1990). The "change" component describes work outside of the scope of the Subcontract, while the "order/fault" component describes the reason that the subcontractor performed the work or incurred the compensable increased cost of performance. Embassy Moving & Storage Co. v. U.S., 191 Ct.Cl. 537, 545, 424 F.2d 602, 607 (1970). Thus, if the owner or General Contractor either expressly or impliedly orders work outside the scope of the Subcontract, or if the owner or General Contractor otherwise causes the subcontractor to perform additional work or to incur increased costs of performance, a constructive change arises for the work performed and extra costs incurred outside of the scope of the subcontract. Latham Co. v. U.S., 20 Cl.Ct. 122, 128 (1990). While the constructive change doctrine provides a means for Subcontractor recovery, the rationale for constructive changes involves the objective of persuading a Subcontractor to continue to work pending resolution of any dispute involving the work at issue. American Line Builders, Inc. v. U.S., 26 Cl.Ct. 1155, 1176 (1992). Here, CEI suffered as a result of each of the numerous and prolonged problems by caused by Granger's purposeful refusal to cure its Project management and subcontractor selection, retention and replacement breaches. Accordingly, CEI now stands entitled to recover from Granger all of CEI's carefully quantified categories of increased Subcontract performance costs.

## B. CEI's CAREFUL QUANTIFICATION OF GRANGER-CAUSED DAMAGES WARRANTS GRANGER'S EXPEDITED APPROVAL OF THIS REQUEST FOR CEI's DEMONSTRABLE SUBCONTRACT DAMAGES

The terms of the Parties' Subcontract, the Parties' contemporaneous communications, Granger's own Project Meeting Minutes, and RIANG correspondence fully confirm CEI's entitlement to full payment of its increased costs of performance, Subcontract damages, including full payment of all CEI's increased direct costs of performance, CEI's substantial delay damages, direct and indirect, and on all sums acknowledged, 10% Subcontract profit and Subcontract overhead and statutory interest.

To prove the amount of an equitable adjustment, the burden of proof lies with the party seeking the adjustment. Mingus Constructors, Inc. v. U.S., 812 F.2d 1387, 1392 (Fed.Cir. 1987); Nager Elec. Co. v. U.S., 194 Ct.Cl. 835, 853, 442 F.2d 936, 946 (1971); Commercial Contractors, Inc. v. U.S., 29 Fed.Cl. 654, 664 (1993). While CEI bears that burden of proof, the law does not require that a subcontractor prove its damages with "absolute certainty or mathematical exactitude." Daly Constr. v. Garrett, 5 F.3d 520, 522 (Fed.Cir. 1993); Wunderlich Subcontracting Co. v. U.S., 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965). The Claims Court aptly explained the rules applicable to proving contract damages:

> In a number of extensive and complex contract cases, including the one at bar, exact computation of damages may prove to be extremely difficult. Therefore, courts have held that, "[t]he ascertainment of damages, or of an equitable adjustment, is not an exact science, and where responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision. It is sufficient if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." Electronic & Missile Facilities, Inc. v. U.S., 189 Ct.Cl. 237, 257, 416 F.2d 1345, 1358 (1969) (citations omitted, emphasis in original). "It is sufficient if he [plaintiff] furnishes the court with a reasonable basis for computation even though the result is only approximate." Wunderlich Subcontracting Co. v. U.S., 173 Ct.Cl. 180, 199, 351 F.2d 956, 968 (1965); see also Capital Electric Co. v. U.S., 729 F.2d 743, 746 (Fed.Cir. 1984); Jackson v. U.S., 12 Cl.Ct. 363, 366-67 (1987); Addison Miller, Inc. v. U.S., 108 Ct.Cl. 513, 557, 70 F.Supp. 893, 900, cert. denied, 332 U.S. 836, 68 S.Ct. 217, 92 L.Ed.

408 (1947). However, leniency as to the actual mechanics of computation does not relieve a contractor of its basic and essential burden of establishing the fundamental facts of liability, causation, and resultant injury." G.M.Shupe, Inc. v. U.S., 5 Cl.Ct. [662] at 737 (1984). American Line Builders, Inc. v. U.S., 26 Cl.Ct. 1155, 1181 (1992). Miller Elevator Co., Inc. v. U.S., 30 Fed.Cl. 662, 702 (2003).

Salem Engineering & Const. Corp. v. U.S., 2 Cl.Ct. 803, 809 (1983).

As a result and due to the other delays noted, CEI was prevented from achieving Subcontract substantial completion anytime sooner than May 26, 2004, some three hundred and sixty (360) days beyond the latest date that CEI would have completed this Project but for Granger's purposeful refusal to cure its Project management and subcontractor selection, retention and replacement breaches. As a result of this extension to the Subcontract performance period CEI has suffered increased costs of performance, lost production, loss of profits on this Project, and extended site and home office overhead. CEI will experience both extended and underabsorbed administration costs. CEI suffered the following Subcontract damages as a result of Granger-caused delays, disruptions and Subcontract breaches delineated above:

**1. Increased Labor Cost Caused By Granger-Caused Delay Of Subcontract Performance**

If Granger had allowed CEI to complete its Subcontract work as planned, CEI would have completed all Work on or before June 1, 2003. Due to the Project delays that Granger caused, Granger forced CEI to perform substantial elements of the Subcontract Work after June 1, 2003, the effective date of an increase in the collective bargaining agreement wage rates applicable to CEI's working forces on this Project. But for Granger's purposeful refusal to cure its Project management and subcontractor selection, retention and replacement breaches, CEI would have completed CEI's bargained-for Subcontract Work before any wage rate increases required by the electric industry union contracts took effect after the bargained-for June 1, 2003 date for Project Substantial Completion. As the direct result of the extended delays attributable solely the fault of Granger, CEI was forced to paid increased labor wage rates for all hours worked on this Project by CEI's working forces during the delayed and extended period required to complete CEI's Subcontract Work.. The following calculations do not include any labor hours for which CEI's has been paid or for which CEI has requested payment for any change order work. The computation of the increased wage rate delay damages is set forth below:

| | |
|---|---|
| Collective Bargaining Agreement wage rate increase effective Aug. 15, 2003 | $ 1.00 |
| Non-Change Order Hours Worked from August 15, 2003 through May 26, 2004 | 10,037 |
| Total | $10,037.00 |
| | |
| Collective Bargaining Agreement wage rate increase effective Dec. 1, 2003 | $ 0.50 |
| Non-Change Hours Worked from December 1, 2003 through May 26, 2004 | 6,084 |
| Total | $ 3,042.00 |
| | |
| **Total Increased Non-Change Order Labor Costs** | **$13,079.00** |

**2. Loss Of Project Foreman's Labor Productivity**

In violation of the parties' "time is of the essence" Subcontract, and as a result of Granger's purposeful refusal to cure its Project management and subcontractor selection, retention and replacement breaches, CEI's Subcontract Work on this Project became available only in small, substantially delayed, inefficient fragments. Instead of being allowed to undertake the Work as the specifications promised, a full section, a full area and a full system at a time, available for work at CEI's discretion, and in dry, non-hazardous conditions, Granger unreasonably delayed completion of critical path work activities and released only partial work areas to CEI for construction. As a result of the Granger's acts and omissions which caused a radical decrease in the availability of work areas, CEI had to allocate inordinate amounts of Project supervision resources to the burdensome tasks of shifting and directly supervising CEI manpower to complete work on the scarce and very limited work areas haltingly and belatedly made available by Granger. Because Granger denied CEI reasonable access to the Work, CEI's Project foreman was prevented from working as planned on this Project and instead was forced into performing primarily only supervisory duties and administrative tasks, pressing Granger to prepare suitable portions of the Work for CEI's critical work activities, preparing numerous change order proposals, submitting RFI's, laying out relatively small pieces of the Work in highly fragmented and dispersed work areas, and moving between highly dispersed working forces to assure adequate supervision and coordination. The specific damage computations are set forth below:

| Week Ending | | Hours |
|---|---|---|
| 02-08-03 | | 38 |
| 02-15-03 | | 40 |
| 02-22-03 | | 29 |
| 03-01-03 | | 40 |
| 03-08-03 | | 34 |
| 03-15-03 | | 40 |
| Total Hours | = | 221 |
| Hourly Rate of Pay | = | $57.22 |

**Total Lost Project Foreman's Productivity** (221 x $57.22) **$12, 645**

**3. Increased Project Manager Labor Hours**

The inefficiencies suffered by CEI on this Project are obvious and well documented. Because of the project delays caused by Granger, CEI was forced to have its Project Manager spend an additional year, from June 1, 2003 through May 26, 2004, assigning ten (10) labor hours per week to managing the unnecessarily delayed and protracted Granger Project. At the hourly rate of $75 times ten (10) hours per week time 48 weeks amounts to $36,000.

**Cost of Increased Project Manager Labor Hours** **$36,000**

## 4. Increased Labor Hours

The inefficiencies suffered by CEI on this Project are obvious and well documented. The labor hours worked by CEI's working forces were stripped of their normal productivity due to the Project problems, delay and work fragmentation caused by Granger. CEI suffered a loss of normal worker productivity recorded on all its other Project because Granger forced CEI to work in wet and rusty conditions and to shift its highly skilled electricians from small portions of the Work in a "piecemeal", fragmented, unpredictable and inefficient manner. The following facts establish CEI's labor force productivity losses:

As of May 26, 2004 CEI expended 17,417 labor hours on this Project .

From the total 17,417 labor hours, 1,426 labor hours must be subtracted as labor hour worked on approved change order, for a net total of 15,991 non-change order Project labor hours

CEI's conservatively calculated bid price planned for 12,995 labor hours.

CEI was forced to expend 2,996 extra non-change order labor hours (15,991 – 12,995 = 2,996) due to Granger's purposeful refusal to cure its Project management and subcontractor selection, retention and replacement breaches.

CEI's average cost per labor hour on this Project is $50.89.

As a result of the delays and disruptions caused by Granger, CEI was forced to expend not less than 2,996 additional labor hours, at an average cost of $50.89 per hour for a total of $152,466.44. (2,996 x $50.89)

**Cost of Increased Labor Hours** **$152,466**

## 5. Project Lost Profits

CEI's has a proven ability to regularly "pick up" or save, in the form of built-in profit, at least 20% of the total labor hours included in CEI's carefully and conservatively calculated project bids. CEI used Michael Desmaris as its project foreman for this Granger Project. On the last three CEI projects on which Michael Desmaris served as CEI's Project Foreman, CEI achieved an average of an additional 20.95% extra profit or "pick up" calculated by reference to CEI's as-bid total labor hours: (Seekonk School Dept – 12.11%; CCRI Mega Space – 28.55%; and Warwick Library –22.2%). Accordingly, based upon CEI's as-bid Project labor hours, CEI's historic 20.95% profitability on project run by Project Foreman Desmaris, and in light of the undisputed facts on the record that establish Granger's delay claim liability to CEI, Granger must compensate CEI for its direct lost profits on this unmanaged Project in the amount of 20% of the labor estimate included in its original bid. This lost labor productivity calculation is very

conservative because it relies upon CEI's proven track record for achieving substantial labor savings in successfully completing similar projects:

CEI's conservatively calculated bid price planned for 12,995 labor hours

20% of 12,995 = 2,599 hours

CEI's average cost per labor hour on this Project is $50.89.

2,599 x $50.89 = $132,263.

**Amount of Project Lost Profits** **$131, 263**

**6. Extended Home Office Administration**

CEI had every reason to rely upon its "time is of the essence" Subcontract right to perform the Work on this Project in a rational and unimpeded fashion. Indeed, CEI retains an enforceable Subcontract right to recover all categories of delayed damages suffered because Granger unilaterally elected to deprive CEI of CEI's basic bargained-for Subcontract right to complete the Work without hindrance, without denial of access to the Subcontract Work, without extended delays and without all of the inefficiencies and disruptions that Granger unreasonably imposed for unnecessarily extended periods of Project-wide delays to the Project's core critical path work activities. In no respect did CEI or any of its Subcontractors or suppliers delay any critical construction. Only Granger and Granger's secret decision to repudiate Granger's Project management obligations caused the delays, disruptions and increased costs suffered upon CEI's Project work efforts. As a result, Granger now stands liable for delaying the completion of the Work from not later than June 1, 2003 through May 26, 2004, the date of the Subcontract substantial completion, an overall three hundred and sixty (360) day compensable Project delay and extension period in which Granger was forced to stand-by to attack and complete each work fragment sporadically and unpredictably released by Granger to CEI.

Because Granger bears responsibility for each day of delay included in this three hundred and sixty (360) day compensable Project delay period, CEI stands entitled to the Subcontract damages suffered during this extended period of delay, including the added cost of Extended Home Office Administration. Indeed, during the 360 day period of compensable delay, CEI incurred two major forms of Subcontract delay damages: additional extended general conditions and extended unabsorbed home office overhead expenses. CEI computes its unabsorbed home office overhead expense according to the widely accepted Eichleay formula. The Eichleay formula has served for more than 30 years as the primary, legally validated, arithmetic formula for calculating increased overhead costs caused by compensable construction delays. The United States Court of Appeals for the Federal Circuit delineates the history of the Eichleay formula and its application to extended overhead cases in C.B.C. Enterprises, Inc. v. United States, 978 F.2d 669 (Fed. Cir. 1992).

Throughout the 24 month period in which Granger bogged down CEI on this unnecessarily protracted Project, this Project consistently represented the largest element of CEI's construction activity. As fully confirmed by the Parties' contemporaneous communications, CEI fully satisfies each of the elements of proof that must be demonstrated to recover its home office overhead calculated pursuant to the

Court-tested and Court-validated Eichleay method. Only, Granger was responsible for the delays suffered by CEI during the subject 360 days of compensable Eichleay delay damage extension. CEI stands entitled to recover its total Eichleay damages in the amount of $80,280.00 as compensation for its actual unabsorbed home office overhead damages suffered during the subject 360 days of Project delay. CEI's detailed computation of its compensable Eichleay delay damages caused by Granger are set forth below:

CEI calculates a $223.00 per diem unabsorbed home office overhead cost on this Project. CEI's Eichleay calculations include the following amounts: total adjusted RIANG Project Subcontract revenue of $1,589,321.00[1] and $4,200,875.00 as CEI's average total Subcontract revenues for the original 391 day Subcontract period and $442,398.00 as the total CEI overhead for the Subcontract period. In addition to using a reasonable period of 360 days of delay, CEI's Eichleay calculations are highly discrete, excluding from its home office overhead account, all expenses allocable to any particular Subcontract.

The Eichleay Formula relies upon the ratio of a particular project's revenues (i.e. CEI Construction RIANG revenues) to total revenues during the extended period of Subcontract performance (CEI Construction revenues on all CEI projects) and applies that ratio against total CEI Construction overhead for all projects undertaken by CEI during the extended Subcontract performance period. The following is a calculation of the delay cost, Extended Home Office Administration, is based on the Eichleay Formula and CEI's books and records.

EICHLEAY FORMULA

| | | | |
|---|---|---|---|
| RIANG Subcontract Billings: / Total Billings For Subcontract Period: | $1,589,321.00 / $4,200,875.00 | 0.378 | |
| Total Average Overhead For Subcontract Period | | $442,398 | |
| Overhead Allocable To Subcontract (0.378 x $442,398.00) | | $167,226 | |
| Total Days Of Subcontract Performance (May 7, 2002 - May 26, 2004) | | 751 days | |
| Daily Subcontract Overhead ($167,226.00 / 751 days) | | $223 | |
| Amount Claimed ($223.00 x 360 days of delay) | | $80,280 | |
| **Total Amount of Extended Home Office Administration** | | | **$80,280** |

## 7. Extended General Site Condition Costs

Just as Granger's abdication of its project management obligations greatly extended the Subcontract performance period and caused CEI to suffered greatly increased extended home office administration expenses not absorbed by any corresponding increase in revenues on this unnecessarily extended Project,

[1] This amount includes approved but unpaid change orders in the amount of $18,868.00.

so too did CEI's site expenses greatly increase. Granger's sole fault for each of the three hundred and sixty (360) days of the extended period of Subcontract performance likewise renders Granger liable for CEI's extended site condition costs. Therefore, as a result of the unanticipated, compensable delay caused by Granger, CEI stands entitled to its extended Site condition costs during the period extending from June 1, 2003 through May 26, 2004, the date of Project substantial completion, a long, troublesome and very expensive 360 period of Granger caused delay.

| | | |
|---|---|---|
| Project Supervisor @<br>or $320.00 day x 250 work days: | | **$ 80,000** |
| Cleanup & Handling - 1 man 5 hrs. per day @ $32.45<br>per hr., or $162.25 per calendar day x 250 work days | | **$ 40,562** |
| Job Site Telephone | | **$ 125** |
| Extended Tool Usage (detailed in Tool Cost Exhibit) | | **$ 47,301** |
| Lifts | | |
| Original Price for Lifts included in CEI's Project Estimate | $23,100 | |
| Lift Costs Amounts Included in Change Orders | $14,600 | |
| Total | $37,700 | |
| Total Amount Actually Spent by CEI on Lifts | $52,374 | |
| | $37,700 | |
| Additional Extra Lift Costs Due to Granger's Delays | **$14,674** | **$ 14,674** |
| Trailers | | |
| 4 Storage Trailers each at $90 per month (4 x 90 = $360) | | |
| 1 Office Trailer at $120 per month | | |
| Total Monthly Cost for Trailers: $360.00 + $120.00 = $480 per month | | |
| 12 Months Compensable Delay 12 x $480 = $5,760 | | |
| Additional Extra Trailer Costs Due to Granger's Delays | | **$ 5,760** |
| **Extended Site Condition Costs Due to Granger's Delays** | | **$188,422** |

## 8. Unpaid, Completed Change Order Work

Granger has unreasonably refused to pay CEI for valuable and fully completed change order work performed by CEI in compliance with a number of express change orders explicitly required by Granger.

In addition to the other change orders listed below, Granger specifically instructed CEI to proceed immediately with the installation of temporary power and lighting by letter dated September 29, 2003. CEI itemized these outstanding, completed change orders by letter dated May 27, 2004:

| Description | Cost |
|---|---|
| Wire Dishwasher | $ 224 |
| Wire Owner's machinery | $ 414 |
| Garage Door | $ 665 |
| Power for Air Compressor | $ 519 |
| Misc. Work in Room #118 | $ 1,438 |
| Premium Time Work | $ 1,140 |
| Extend Terminal Cabinets | $ 1,919 |
| Temporary Power & Lighting | $12,549 |

**Total Owed From Unpaid Change Orders** **$18,868**

NOTE THAT THIS $18,868 AMOUNT THAT GRANGER OWES TO CEI FOR COMPLETED BUT UNPAID CHANGE ORDER WORK IS NOT INCLUDED IN THE TOTALS SET FORTH BELOW EXCEPT AS NECESSARY TO CALCULATE THE BOND CLAIM PREMIUM INCREASE.

**CEI RIANG PROJECT**
**Damage Summary**

| | |
|---|---|
| **Total Labor Rate Increase Delay Damages** | **$ 13,079** |
| **Loss Of Superintendent's Labor Productivity** | **$ 12,645** |
| **Increased Project Manager Labor Hours** | **$ 36,000** |
| **Cost of Increase Labor Hours** | **$152,466** |
| **Project Lost Profits** | **$131,263** |
| **Extended Home Office Administration** | **$ 80,280** |
| **Extended General Site Condition Costs** | **$188,422** |
| **Total Claim for Extended and Impacted Performance** | **$614,155** |

**Mark-Ups**
**Subcontract Profit Calculation**

| | |
|---|---|
| 10% on the first $20,000.00 ($20,000.00 x 0.1) | **$ 2,000** |
| 7 ½ % on the next $30,000.00 ($30,000.00 x 0.75) | **$ 2,250** |
| 5% on the balance over $50,000.00 ($564,155 x 0.05) | **$ 28,207** |

**Subcontract Overhead Calculation**

| | |
|---|---|
| 10% on the first $20,000.00 ($20,000.00 x 0.1) | **$ 2,000** |
| 7 ½ % on the next $30,000.00 ($30,000.00 x 0.75) | **$ 2,250** |
| 5% on the balance over $50,000.00 ($564,155 x 0.05) | **$ 28,207** |

| | | |
|---|---|---|
| **Total Mark-Ups** | **$ 64,914** | |
| **Claim Total With Mark-Ups** | | **$679,069** |

**Bond Premium Increase**
CEI must pay a bond premium on the increased amount Granger must now pay CEI. The incremental rate applicable to the bond CEI purchased with respect to this Project carries an incremental rate of 1.2%.

| | |
|---|---|
| **Claim Total With Mark-Up** | **$679,069** |
| **Unpaid Change Orders** | **$ 18,868** |
| **Sub-Total** | **$697,755** |
| **Bond Premium Increase (1.2%)** | **$ 8,373** |
| **TOTAL GRANGER CLAIM LIABILITY** | **$706,128** |

**CEI ALSO NOTES THAT IN ADDITION TO THE UNDISPUTED $18,868 FOR COMPLETED, BUT UNPAID, CHANGE ORDER WORK, GRANGER MUST ALSO PROMPTLY PAY TO CEI EARNED AND OWED RETAINAGE IN THE AMOUNT OF $156,927.70 THAT IS NOW DUE FROM GRANGER TO CEI.**

## CERTIFICATION

This claim is made in good faith, the supporting data is accurate and complete to the best of my knowledge and belief, and the amount requested accurately reflects the Subcontract adjustment for which I believe that Granger is liable.

Sincerely,

Roy Dailey
Vice President
Commercial Electric, Inc.

RD/csd

**cc:** **Kathleen M. Flanagan**
**Attorney-in-Fact**
**St Paul Fire & Marine Insurance Co.**
**385 Washington Street**
**St. Paul, MN 55102**
**Payment Bond dated April 18, 2002, Payment Bond No. SR1482**
**For R.W. Granger & Sons, Inc. Contract No. DAHA37-02-C-001**

Charles S. Kirwan, Esquire

| DESCRIPTION | COST / MO. | TOTAL COST FOR 12 MO. |
|---|---|---|
| 2 ½" or 5/8" Pulling Ropes | $ 17.84 | $ 428.16 |
| 1 ¾ Hickey | $ 6.50 | $ 78.00 |
| 1 ¾ Offrit Bender | $ 6.50 | $ 78.00 |
| 1 ¾ Threader | $ 13.38 | $ 160.56 |
| 11 ¾" EMT Benders | $ 7.18 | $ 947.76 |
| 1 1 ¼" EMT Bender | $ 17.34 | $ 208.08 |
| 5 1" EMT Benders | $ 10.48 | $ 628.80 |
| 1 1" Rigid Hickey | $ 9.93 | $ 119.16 |
| 1 10' Ladder | $ 57.14 | $ 685.68 |
| 1 12' Ladder | $ 62.50 | $ 750.00 |
| 2 18 v Dewalt Battery Drills | $ 80.03 | $ 1,920.72 |
| 1 3" Punch | $ 15.44 | $ 185.28 |
| 1 40' Exterior Ladder | $ 89.83 | $ 1,077.96 |
| 1 6' Ladder | $ 25.00 | $ 300.00 |
| 2 8' Ladders | $ 35.72 | $ 857.28 |
| 1 Bosch Sm. Electric Hammer Drill | $ 89.82 | $ 1,077.84 |
| 5 Dewalt ½" Elec. Drill | $ 68.18 | $ 4,090.80 |
| 2 Dewalt 18v Sawzall | $ 80.03 | $ 1,920.72 |
| 2 Evans Bender | $ 52.64 | $ 1,263.36 |
| 1 GRD Tester | $ 165.85 | $ 1,990.20 |
| 1 Greenlee K.O. set & 4" Punch | $ 123.72 | $ 1,484.64 |
| 1 Greenlee Vacuum | $ 111.42 | $ 1,337.04 |
| 1 Hilti TE 55 | $ 136.86 | $ 1,642.32 |
| 6 Makita 9.6v Batt. Drills | $ 53.37 | $ 3,842.64 |
| 1 Makita Generator | $ 176.43 | $ 2,117.16 |
| 1 Mega | $ 126.07 | $ 1,512.84 |
| 1 Milwaukee Band Saw Elec. | $ 125.99 | $ 1,511.88 |
| 1 Milwaukee Chop Saw Elec. | $ 51.79 | $ 621.48 |
| 1 Milwaukee Sawzall Elec. | $ 41.47 | $ 497.64 |
| 1 Oiler | $ 22.94 | $ 275.28 |
| 2 Panasonic Batt Hammer Drill | $ 89.82 | $ 2,155.68 |
| 1 Pipe Threader | $ 240.88 | $ 2,890.56 |
| 1 Pony | $ 101.77 | $ 1,221.24 |
| 4 Reel Jacks | $ 18.11 | $ 869.28 |
| 1 Small Exterior Ladder | $ 30.79 | $ 369.48 |
| 2 Small Gangbox | $ 25.22 | $ 605.28 |
| 1 Small Set Wire Cutters | $ 16.56 | $ 198.72 |
| 1 TE – 15 | $ 68.18 | $ 818.16 |
| 1 TE – 5 | $ 68.18 | $ 818.16 |
| 1 TE – 5 | $ 68.18 | $ 818.16 |
| 1 Tripod | $ 13.23 | $ 158.76 |
| 2 Walkie Talkies | $ 115.29 | $ 2,766.96 |
| **GRAND TOTAL:** | | $ 47,301.72 |

# Commercial Electric, Inc.

491 Waterman Avenue
East Providence, Rhode Island 02914

Phone 401 438-0707
Fax 401 438-0709


June 15, 2004

R.W. Grainger & Sons, Inc.
415 Boston Turnpike
Shrewsbury, MA 01545
ATTN: Mr. Max Jordan

RE: <u>C130 J Maintenance Hanger and Shops</u>
<u>North Kingstown, RI</u>

Gentlemen;

Since R.W. Granger had always consistently admitted its fault for all RIANG delays, we are surprised that Granger is now complaining that we are enforcing our contract rights. If Granger intends to retaliate against Commercial Electric for exercising our right to bring a delay damage claim, then our range of remedies against Granger will expand. We urge Granger in the shortest possible terms to promptly pay us the undisputed balance for retainage, $156,927.70, and the undisputed balance for change orders, $22,630.00. In the event that Granger attempts to punish Commercial Electric for presenting our delay claim by an attempt on Granger's part to wrongfully withhold final retainage and payment for completed change order work, then we will authorize our attorneys not only to commence the seemingly inevitable bond claim action, but also to seek a court order attaching any reachable assets that Granger may still control.

Sincerely,

Roy Dailey
Vice President
Commercial Electric, Inc.

RD/csd

Cc: Frank Bianco
Mike Desmaris

**Plaintiff's Exhibit 3**