UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA
FOR THE USE AND BENEFIT OF
CE.I., INC, dba COMMERCIAL ELECTRIC, INC.
Plaintiff

v. C.A. No. 04-263T

R.W. GRANGER & SONS, INC. and
ST. PAUL FIRE & MARINE INSURANCE CO.
Defendants

**PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION TO STAY ARBITRATION AND CROSS-MOTION TO COMPEL ARBITRATION**

Plaintiff Commercial Electric, Inc. ("Plaintiff) hereby objects to Defendant Granger's Motion to Stay Arbitration and Plaintiff cross-moves to secure an Order compelling the Defendants to submit all disputes to arbitration. In support of this objection and cross motion to compel arbitration Plaintiff files the requisite memorandum.

WHEREFORE, Plaintiff respectfully requests that the Defendants' motions be denied and that the Court impose an Order compelling the Defendants to arbitrate to comply with their clear obligation to do so.

Respectfully submitted,

PLAINTIFF C.E.I., INC.

By its Attorneys,

CHARLES S. KIRWAN & ASSOCIATES

Charles S. Kirwan (Bar #4050)
204 King Philip Street
Providence, RI 02909

(401) 272-6800
(401) 272-6875 (fax)

CERTIFICATE OF SERVICE

I, Charles S. Kirwan, hereby certify that on this 14th day of 2005, that I transmitted via fax and mailed first class postage prepaid a copy of the foregoing to Defendants' counsel of record Mark Russo, Esquire, and Christopher Mulhearn, Esquire, FERRUCCI RUSSO P.C., 55 Pine Street, 4th Floor, Providence, RI 02903.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA
FOR THE USE AND BENEFIT OF
CE.I., INC, dba COMMERCIAL ELECTRIC, INC.
Plaintiff

v. C.A. No. 04-263T

R.W. GRANGER & SONS, INC. and
ST. PAUL FIRE & MARINE INSURANCE CO.
Defendants

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S OBJECTION TO DEFENDANTS' "ARBITRABILITY" MOTION**
**PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION TO STAY ARBITRATION;**
**AND**
**PLAINTIFF'S CROSS-MOTION TO COMPEL ARBITRATION**

Plaintiff Commercial Electric, Inc. ("Plaintiff) files this memorandum in support of its objection to Defendant Granger's Motion for Leave to Determine Whether Certain Issues Are Subject to Arbitration and its objection to the Motion to Stay Arbitration and in support of Plaintiff's cross-motion for an Order compelling the Defendants to complete the arbitration of all disputes now scheduled for arbitration.

## I. FACT SUMMARY

Defendants baselessly and belatedly claim the need for a stay of five days of arbitration hearings that were set to start on December 15, 2005 in the parties' case now pending before the American Arbitration Association. Commercial Electric, Inc. and R.W. Granger & Sons, Inc. and St. Paul Fire & Marine Ins. Co., AAA Case No. 11 110 Y 023676 04. Defendants argue that a discrete "arbitrability" issue bars adherence to arbitration schedule set by the parties' duly selected Arbitrator in the case. Defendants identify no bona fide "arbitrability" issue. Even if such any such "arbitrability" issue had ever existed, which never was the case, Defendants'

admissions in their stay papers now before this Honorable Court conclusively prove that the Defendants' prior motions practice directed solely and voluntarily to the Arbitrator failed to raise, and did not preserve, any such putative "arbitrability" issue.

Defendants' "arbitrability" issue pertains solely to the meaning of contract damage limitation provisions that the Arbitrator found to be "ambiguous and contradictory." Such contract interpretation disputes are presumptively arbitrable. Furthermore, it must be noted that Defendants' contract interpretation arguments are extremely misleading[1] and plainly seek to confuse the clear and well-worn meaning of the specified contract clauses that define certain categories of damages recoverable by the Plaintiff. Without regard to Defendants' lack of a textual basis for their contract interpretation escapades, nevertheless, Defendants' stay papers purport to identify the following alleged "arbitrability" issue regarding the entirely illusory "damage claim limitation" arguments aggressively advanced by the Defendants at this 11th hour:

> "..whether certain of the claims advanced by plaintiff ... to wit, claims related to home office overhead, extra equipment costs, and lost profits, may be arbitrated and/or are subject to arbitration under the parties' subcontract, pursuant to R.I.Gen. Laws § 10-3-5."

See Defendants' Motion p.1.

Defendants admit that they submitted this very same "damage claim limitation" issue to the Arbitrator in the form of a pre-hearing motion for partial summary judgment (styled as a motion for summary disposition) to limit Plaintiff's damage claims. We are here, rather than conducting the arbitration, because Defendants did not secure a preemptive, pre-hearing bar to the Arbitrator's further consideration of the "damage claim limitation" issues.

---

[1] Plaintiff's Exhibit 2 attached hereto refutes all of the many contract limitation arguments baselessly repeated in the Defendants' "arbitrability" Brief to in connection with this Motion. Many clear misstatements are included in both iterations of the Defendants' baseless contract argument. Plaintiff disputes each and every assertion in both of the Defendants' damage limitation briefs submitted first to the Arbitrator and now to this Honorable Court,

The Arbitrator made a two-point ruling on the Defendants' pre-hearing motion for partial summary judgment:

> 1. Arbitrator's Ruling on DEFENDANTS' MOTION FOR SUMMARY DISPOSITION – Denied. The Arbitrator finds that the Agreement between R.W. Granger & Sons, Inc. and Commercial Electric, Inc. dated April 12, 2002, is ambiguous and contradictory and does not meet the "test" of a contract certainty of unambiguous and clarity.
>
> 2. The Arbitrator will hear argument and determine resolution with no intent of re-writing the Contract (Agreement). At this time, it is unclear as to the intent and nexus to the actual claim.

See Plaintiff's Exhibit 1 attached hereto.

## II. LEGAL ARGUMENT

These defense motions have no legal merit, no factual accuracy concerning the disputed contract terms, pose no close "arbitrability" question, and should be voluntarily withdrawn immediately. In support of this objection and cross-motion to compel, Plaintiff further cites

1. The controlling arbitration statute that the Defendants rely upon to seek a belated stay of arbitration in favor of litigation, requires the exact opposite, a stay of litigation pending arbitration, and an order compelling arbitration without further interlocutory interruptions. Compare R.I.G.L. § 10-3-5 [2] (expedited trial to

[2] Defendants errantly argue that a stay is required by R.I.G.L § 10-3-5, which provides that: "If <u>the making of the arbitration agreement</u> or the failure, neglect, or refusal to perform the arbitration agreement is in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded, the court shall hear and determine the issue. Where such an issue is raised, either party may, on or before the return day of the notice of application, demand a jury trial of the issue, and upon the demand of a jury trial the court shall make an order referring the issue or issues to a jury as in equity causes. If the jury finds that no agreement in writing for arbitration was made, or that there is no default in proceeding thereunder, the proceeding shall be dismissed. **If the jury finds that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof."** No such fact issues exist. The parties made a comprehensive arbitration agreement and Defendants are refusing to comply with their obvious contract duty to arbitrate. An Order compelling Arbitration is now fully warranted.

determine disputed facts concerning the making of an agreement to arbitrate) and R.I.Gen. Laws § 10-3-3 (stay of litigation referable to arbitration).[3]

2. The two prior Orders to arbitrate in this case, as prepared by the Defendants, "stay the instant action pending arbitration pursuant to R.I.Gen. Laws § 10-3-3." It is respectfully submitted that an Order compelling Arbitration is likewise now warranted before the Defendants again attempt to delay arbitration.[4]

3. Absolutely no "arbitrability" issue is discernable on this record comprised solely of disputes about **contract language interpretations** asserted by lawyers. The putative "arbitrability" issue identified by the Defendants lies at the very heart of mandatory subjects for arbitration: the **disputed meaning of contract clauses** (damage clauses).[5]

4. As a matter of uncontested, admitted fact, the Defendants already decided the putative "arbitrability" issue by unilaterally submitting the damage clause dispute to the Arbitrator for pre-hearing decision. See Defendants Brief at pp. 4-5. The record is complete and uniformly confirms that the Defendants raised no arbitrability objection to the Arbitrator. Id. Having argued to the Arbitrator that he had the power to decide that the identified contract terms barred certain damage claims made by the Plaintiff, the Defendants are now estopped from coming to this Court to argue the exact opposite, that the Arbitrator had no power to arbitrate the meaning of the disputed damage limitation clauses.[6]

---

[3] This matter is controlled by R.I.G.L § 10-3-3, entitled "Stay of actions on issues referable to arbitration," which provides that: "If any suit or proceeding be brought upon any issue referable to arbitration under an agreement in writing for arbitration, the court in which the suit is pending, upon being satisfied that the issue involved in the suit or proceeding is referable to arbitration under such an agreement, shall, on application of one of the parties, stay the trial of the action until the arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with the arbitration." A Third Order of this Honorable Court should now enter, again staying any litigation pending arbitration, and compelling compliance with the Defendants' contract duty to arbitrate.

[4] See text of cited, controlling statutes in footnotes 1 and 2.

[5] United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L. Ed. 2d 1403 (1960) (If the issues presented are on their face referable to arbitration under the parties' agreement, the inquiry of the court is at an end .).

[6] D & H Therapy Assoc. v. Murray, 821 A.2d 691, 693-94 (R.I. 2003) ("Judicial estoppel precludes a party from taking a position inconsistent with the position previously taken with respect to the identical party in an earlier law suit.") ("Having eaten his cake, defendant may not renounce its calories.").

5. Defendants' submission of the damage clause dispute to the Arbitrator for his decision constituted an affirmative and conclusive **waiver** any putative "arbitrability" defense.[7] No where in the Defendants' Motion for Summary Disposition" does the word "arbitrability" appear. Defendants made absolutely no argument to the Arbitrator that the disputed meaning of the identified damage limitation clauses was not subject to arbitration. A party seeking to dispute the arbitrability of a matter has two safe procedural choices neither or which the Defendants employed in this matter.

6. Furthermore, the failure to pose a particular argument to the arbitrator that is available to be made before the arbitrator makes a decision conclusively waives that argument in collateral proceedings regarding the arbitration[8] As in any (de facto) appeal, the "raise it or waive it" rule" compels a party to advance an argument to the arbitrator before claiming arbitral error based upon that argument. Defendants have lost no ground. No bona fide arbitrability argument ever existed.

7. Defendants' submission of the damage clause dispute to the Arbitrator for his decision constituted Defendants' knowing and binding **election of remedies**[9] that bars this de facto attempt to secure a pre-hearing, interlocutory, advisory opinion in the form of a declaratory judgment from a court of law regarding the meaning,

---

[7] Waradzin v. Aetna Casualty & Sur. Co., 570 A.2d 649, 651 n. 2 (R.I. 1990) (confirming fire damage insurance arbitration award) ("This court has recognized that a party wishing to object to the arbitrability of a dispute must state his objection on those grounds at the arbitration hearing or refuse to submit to the process and pursue his remedy in court [by timely seeking a stay of arbitration]." Providence Teachers' Union Local 958 -- American Federation of Teachers v. Providence School Committee, 433 A.2d 202, 204 (R.I. 1981)). Footnote 2 in Waradzin confirms the applicability of this judicially imposed rule to non-labor arbitrations: "Although we realize that this principle has been established through labor-arbitration cases, we find it equally applicable in this case.").

[8] Chicago Newspaper Guild v. Field Enterprises, Inc. Newspaper Div., 747 F.2d 1153, 1156 (7th Cir. 1984) (court rejected argument because it was not presented to the arbitrator below); United States Postal Serv. v. Nat'l Ass'n of Letter Carriers, 49 Fed. Appx. 488; 2002 U.S. App. LEXIS 22995 (4th Cir. 2002) (error for district court to vacate arbitral award based upon an argument first presented to the district court).

[9] Cranston Teachers Association v. Cranston School Committee, 423 A.2d 69, 71 (R.I. 1980) (applying election of remedies principles and holding that when a party had sought to invoke the grievance procedures of a collective bargaining agreement, it was "foreclosed from seeking redress in the Superior Court" in the form of a declaratory judgment); School Committee of the Town of North Kingstown v. John Crouch, 808 A.2d 1074 (R.I. 2002) (tenured teacher who pursued grievance mechanism, while filing statutory appeal and attempting to hold that appeal process in abeyance, as a matter of law elected grievance remedy and was barred by election of remedies doctrine from opting out of that election when the he lost the grievance).

applicability and interplay of the disputed damage limitation clauses that the Defendants already submitted to the Arbitrator for his decision.

8. In addition, laches bars the instant defense motions because the Defendants' course of conduct violates the equitable requirement that a party seeking a stay of arbitration by resort to an action for declaratory relief must act promptly and without prejudice to the rights of other parties involved in the on-going arbitration process.[10]

9. Finally, Defendants prematurely and inappropriately attack a mere procedural ruling[11] that has no cognizable, definitive or reviewable consequences. Defendants identify no arbitral final order ripe for judicial review, but instead unreasonably interrupt arbitral proceedings and impermissibly seek an interlocutory advisory opinion that unreasonably interferes with the Arbitrator's broad and inherent power to make procedural rulings to control and expedite arbitration hearings and final decisions.

---

[10] Cruz v. Wausau Ins., 866 A.2d 1237 (R.I. 2005) (The Uniform Declaratory Judgments Act confers broad discretion upon the trial justice as to whether he or she should grant declaratory relief.) (Cruz n. 5 "[Declaratory relief ordinarily should not be granted when adverse parties already have proceeded reasonably far down another dispute-resolution path.")

[11] Purvis Systems, Inc. v. American Systems Corp., 788 A.2d 1112, 1114 (R.I. 2002) ("The limited scope of judicial review of arbitration awards by the Superior Court is essential to ensure that parties may benefit from arbitration as an informal, expedient alternative to litigation in the court system.") ("The defining feature of the arbitral forum is the absence of the strictures --and the protections --of formal procedural and evidentiary rules. When private parties, acting on equal footing, voluntarily agree to arbitration with all its risks and benefits as their preferred method of settling disputes, courts should not undermine either the parties' choice or the statutory scheme by imposing specific evidentiary rulings and findings of fact for the purpose of judicial review.").

## III. CONCLUSION

Plaintiff respectfully requests that the Defendants' motions be denied and that the Court impose an Order compelling the Defendants to arbitrate to comply with their clear obligation to do so.

Respectfully submitted,

PLAINTIFF C.E.I., INC.

By its Attorneys,

CHARLES S. KIRWAN & ASSOCIATES

Charles S. Kirwan (Bar #4050)
204 King Philip Street
Providence, RI 02909
(401) 272-6800
(401) 272-6875 (fax)

CERTIFICATE OF SERVICE

I, Charles S. Kirwan, hereby certify that on this 14th day of 2005, that I transmitted via fax and mailed first class postage prepaid a copy of the foregoing to Defendants' counsel of record Mark Russo, Esquire, and Christopher Mulhearn, Esquire, FERRUCCI RUSSO P.C., 55 Pine Street, 4th Floor, Providence, RI 02903.

# AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| CEI d/b/a COMMERCIAL ELECTRIC, INC. Plaintiff | | |
| And | | AAA No. 11 110 Y 02376 04 |
| R.W.GRANGER & SONS, INC. ST. PAUL FIRE AND MARINE INSURANCE COMPANIES Defendants | | |

1. Arbitrator's Ruling on DEFENDENTS' MOTION FOR SUMMARY DISPOSITION – Denied. The Arbitrator finds that the Agreement between R.W.Granger & Sons, Inc. and Commercial Electric, Inc. dated April 12, 2002, is ambiguous and contradictory and does not meet the "test" of a contract certainty of unambiguous and clarity.

2. The Arbitrator will hear argument and determine resolution with no intent of re-writing the Contract (Agreement). At this time it is unclear as to the intent and nexis to the actual claim.

3. As the Defendant intends to file a complaint on the Arbitrator's ruling on the motion in Federal Court for a STAY OF ARBITRATION so the Court can rule on the motion, the ARBITRATOR ORDERS the complaint be filed by December 13, 2005. The ARBITRATOR ORDERS the hearings be stayed for two (2) days, to commence on December 19, 2005 at 9:30am.

4. The ARBITRATOR accepts the change of venue of the hearing to CATUOGNO Court Reporting Services, 72 South Main Street, Providence, Rhode Island.

5. The Arbitrator and both Parties agree to the new hearing dates of April 3, 2006 to April 7, 2006. only if the Federal Court rules positive for the MOTION FOR STAY OF ARBITRATION.

6. The ARBITRATOR ORDERS a conference call on Thursday, at 1:00pm for a status report on the Motion for STAY OF ARBITRATION. American Arbitration Association will arrange the conference call.

Richard A. Volkin, Arbitrator December 13, 2005

AMERICAN ARBITRATION ASSOCIATION

C.E.I., INC., d/b/a COMMERICAL
ELECTRIC, INC.,
Claimant,

v. AAA No.: 11 110 Y 02376 04

R.W. GRANGER & SONS, INC.,
and ST. PAUL FIRE AND
MARINE INSURANCE COMPANY
Respondents.

CLAIMANT'S OBJECTION AND CROSS-MOTION FOR SUMMARY DISPOSITION REGARDING THE AVAILABILITY OF "MAKE WHOLE" "RIGHTFUL POSITION" CONTRACT DAMAGES AND MILLER ACT DAMAGES

Claimant Commercial Electric, Inc.'s ("CEI") hereby objects to the misleading motion of Respondents R.W. Granger & Sons, Inc. ("Granger") and St. Paul Fire and Marine Insurance Company. The misleading defense motion impermissibly seeks to deny CEI its core right to use arbitration to enforce the parties' contract bargain that Granger breached and repudiated. The defense motion is also misleading by failing or refusing to address the controlling character of CEI's rights to full relief in this arbitration pursuant to the Miller Act to recover from the surety all of CEI's unpaid actual costs of performance.

The defense motion is important for what it says, and for what it does not say. First, what the defense motion says is extremely misleading, but affirmatively confirms CEI's entitlement to full "make whole" relief under both the contract against Granger and under the Miller Act bond against the surety.

1. The defense motion at bottom admits that the issue presented to the Arbitrator is the proper categories of damages to include in a breach contract damages remedy. **(This is a Breach Case)**

2. The defense motion unintentionally confirms that controlling contract terms allow "**anticipated profit arising directly from the Work**" **(CEI's Project Lost Profits Are Recoverable)**

3. The defense motion unintentionally confirms that controlling contract terms allow recovery of subcontractor **equipment rentals** costs **(CEI's Extra Rental Costs Are Recoverable)**

4. The defense motion affirmatively argues not only on behalf of Granger, but also affirmatively argues on behalf of the surety, purposefully confirming the surety's election of arbitration as the forum to resolve all of CEI's Miller Act claims and remedies. **(All Claims Against the Surety Are Fully Arbitrable)**

5. Finally, the defense motion again asserts the importance of substantive Rhode Island contracts law as the primary basis for arbitral determination of the proper contract remedies available to CEI **(The Rhode Island Law of Contract Remedies Controls )**

Second, the defense motion is extremely important for what it does not say. Critically and misleadingly, the defense motion says nothing about the big picture:

1. CEI presents not only a breach of contract claim, but also a Miller Act bond claim that entitles CEI to recover against the surety all of CEI's unpaid actual costs of performance **(CEI's Comprehensive Miller Act Claims)**

2. The parties' subcontract affirmatively provides that "time is of the essence";

3. There is no claim that Granger's delay was reasonable, overriding any otherwise operative damage limitation provision regarding Eichleay home office overhead damages.

## I. THE DEFENSE MOTION CONSTITUTES A DE FACTO ADMISSION THAT THIS IS A BREACH OF CONTRACT CASE

The defense motion at bottom admits that the issue presented to the Arbitrator is the proper categories of damages to include in a breach contract damages remedy. **The first five cases cited by the defense motion are all Rhode Island breach of contract cases.** Chapman v. Vendresca, 426 A.2d 262 (R.I. 1981) (breach of real estate purchase and sales contract); Elias v. Youngken, 493 A.2d 262 (R.I. 1981) (breach of contract and other claims) Parking Co., L.P. v. Rhode Island Airport Corp., 2005 WL

419827 (R.I. Super. 2005) (breach of contract claim); and Scullian v. Petrucci, 276 A.2d 277 (R.I. 1971) (breach of contract claim).[1]

The core material terms of any contract always involve the same five (5) immutable variables defined by the parties' meeting of the minds: 1) price; 2) quantity; 3) quality; 4) time for performance; 5) time for payment. Here, the near doubling of the subcontract duration without any compensation constituted a material breach of the core promise that this was a bargained-for "time is of the essence" subcontract. In this regard, the defense motion openly admits that: "When the intent of the parties is clear, the parties must abide by the terms of their contract and cannot attempt to change their obligations." Citing Scullian v. Petrucci, 276 A.2d 277 (R.I. 1971) (breach of contract claim). The parties clearly intended a time is of the essence fixed-price contract that would be completed by June 1, 2003. See Granger-CEI "time is of the essence" Subcontract, see AIA Subcontract Article 9. Attached to Defense Motion at Tab B. CEI's schedule of values as approved by Granger (see AIA Subcontract Article 4.1.3), and the CPM schedules that Granger provided to RIANG and CEI all prove that Granger promised CEI a Subcontract substantial completion date of not later than June 1, 2003 (see AIA Subcontract Article 9.3), instead Granger unreasonably breached CEI's fixed price time is of the essence subcontract by imposing upon CEI an uncompensated 360-day contract time extension.

Granger's unreasonable and protracted project delays and knowing failure to cure its subcontractor problems had the effect of knowingly, purposefully and unreasonably violating CEI's core contract rights and thereby voided any otherwise operative limitation on CEI's right to recover all categories of its

[1] The defense motion footnote one argues that "'Waiver is the voluntary, intentional relinquishment of a known right.' Violet v. Travelers Exp. Co., Inc., 502 A.2d 347 at 349 (R.I. 1985) (quoting Haxton's of Riverside, Inc. v. Windmill Realty, Inc., 488 A.2d 723, 725 (R.I. 1985))." CEI reasonably relied upon, persistently sought to enforce, and never ever waived Granger's core material contract promise that the parties had entered into a "time is of the essence" fixed price subcontract. Granger repudiated, and CEI never waived, CEI's core right to enforce the parties' bargained-for express June 2003 project completion deadline.

resulting damages. In Aiello Constr. Inc. v. Nationwide, 413 A.2d 85 (R.I. 1980), the Rhode Island Supreme Court ruled that an owner's failure to make progress payments went to the essence of, and breached, the parties' construction contract, and thereby excused the non-breaching contractor from any further performance or other contractual obligations. When there is such a core material breach, just as the subcontractor's further performance obligations defined by the breached contract are invalidated, so too does the general contractor's breach likewise invalidate any otherwise nominally operative subcontract limitation on the recovery of the non-breaching, innocent subcontractor's demonstrable resulting damages. Indeed, any other damage formula would reward the general contractor's purposeful or reckless contract repudiation and breach, thereby wrongfully depriving the non-breaching party of its entitlement to a full "made whole" remedy according to the common law of contract remedies.[2]

As the basis for this claim, CEI identifies only periods of unreasonable, unnecessary and avoidable delay chargeable to Granger. Indeed, Granger cannot demonstrate that its repudiation of CEI's right to recover for compensable delays was in good faith, or reasonable, or anything other than an unexcused, and unreasonable repudiation of CEI's right to enforce its fixed price, time is of the subcontract.

[2] The formula for the "award [of] damages for breach of contract [is] to place the injured party in as good a position as if the parties fully performed the contract." See Riley v. St.Germain, 723 A.2d 1120 (R.I. 1999), citing Wells v. Uvex Winter Optical, Inc., 635 A.2d 1188, 1193 (R.I. 1994) and R.I. Tpk. and Bridge Auth. v. Bethlehem Steel Corp., 119 R.I. 141, 166, 379 A.2d 344, 357 (1977)). Per AIA 201, 4.6 Arbitration, specifically 4.6.2, of the parties Construction Contract arbitration pursuant to the applicable AAA Rules was mandatory. The applicable AAA Rules are the AAA "Construction Industry Dispute Resolution Procedures (Including Mediation and Arbitration Rules) effective as of July 1, 2003. Per AAA Rule R-1, "Agreement of the Parties", "The parties shall be deemed to have made the [applicable] rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) or under its Construction Industry Arbitration Rules." Per AIA 201, 13.4 Rights and Remedies, specifically 13.4.1, "Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law." Per AAA Rule R-43, Scope of Award, "The arbitrator may grant any remedy or relief, including equitable relief, that the arbitrator deems just and equitable and within the scope of the agreement of the parties."

In his deposition on December 5, 2005, Granger's former President Ernest O'Brien explained that Granger is no longer actively engaged in construction. Mr. O'Brien admitted that Granger suffered "a substantial six figure loss" on the project, and attributed that large loss to Granger having submitted "a poor bid." While the obvious conclusions were resisted by Mr. O'Brien, Granger's errantly underbid its low-ball bid, relied upon steel erection and concrete subcontractors that were not competent or responsible subcontractors that very quickly prejudiced the project schedule and project budget. The evidence will show that Granger acted recklessly and irresponsibly to CEI's obvious detriment, not only by selecting incompetent subcontractors, but also by failing to time find suitable substitutes to protected shared project goals. As the direct and foreseeable result, Granger knowingly and recklessly breached CEI's right to enforce its fixed price time is of the essence subcontract.

While Mr. O'Brian nominally asserts that government time extensions excused all delays, the changes order summary attached hereto confirms that Contract Modification P00004 reports a $13,457,000 contract base price and a 390 day contract performance period. Contract Modification P00023 reports that the final total contract price was $13,950,773, or a net increase of $493,773 or an increase of 3.7% with 405 days of delay. Mr. O'Brien admitted that the government imposed no liquidated damages and likewise paid Granger nothing for the 405 contract extension period. In other words, Granger mismanaged the Project and was let off the hook by the government, while shifting all the costs of Granger's mistakes to CEI in breach of the parties' time is of the essence subcontract.

Note that if Granger's net contract price increase is divided by the 405 day time extension, Granger was paid $1,219 per diem for the 405 day time extension. The reflects the fact that Granger worked the first 390 days for 96.3% of the contract price and the next 405 days for 3.7% of the total adjusted contract price. When the individual time extension contract modifications are reviewed individually and collectively, its is patently obvious that the government let Granger off the hook to

assure that a mismanaged and failing project did not result in a default that would have imposed much more serious harm and much greater prejudice to the government's own legitimate contract expectations. RIANG pressing need for a completed new C-130J hanger must be kept in mind. As a result, Granger did not to protect or preserve CEI's legitimate contract rights and expectations and now Granger and its surety stand full liable for all of CEI's resulting damages.

It is truly amazing that a 390-day project can experienced a 405 day contract extension period in which no liquidated damages and no compensable days of delay are recognized. At bottom, Granger was in trouble, having substantially under-bid the project, having selected and retained incompetent subcontractors, having suffered a major six-figure loss on the project, and having recorded a 405 day delay. Rather than enforce CEI's right to a time is of the essence subcontract, Granger repudiated CEI's contract rights, did nothing to protect CEI's core contract right, Granger instead did whatever it had to do to get out of the job at any cost. From the owner's perspective, it is clear that every possible accommodation was made to keep Granger from sinking under the weight of its crucial pricing, subcontractor selection and project management mistakes.

For example, even though the invitation for bids and contract expressly spelled out ever single holiday recognized by the Air National Guard in Quonset, Contract Modification P00015, that we shall refer to it as the second winter "Mercy Mod", wrote off Granger's project mismanagement and allowed Granger a 96-day zero-dollar time extension on the basis of the following rather amazing time extension narrative: "Conditions beyond control of the contractor; weather consisting of snow, rain and wind and TriState Steel Bankruptcy and holidays for Dec 03, Jan 04 and Feb 04."

Santa may have stopped at the Granger house that year, but Granger kept all the goodies hidden from CEI. While the meeting minutes report the Contracting Officer's growing and abiding concerns about the slipping schedule, the contract modifications generously gave repeated time extensions that did

nothing more than keep Granger's head just above water at the expense of CEI and other laboring subcontractors. Granger recklessly and knowing repudiated CEI's core right to a fixed price time is of the essence subcontract.

In addition to the Aiello breach of contract analysis that bars inequitable enforcement of any damage limitation provision that would otherwise provide unwarranted immunity to contract liability and unreasonably protect a defaulting party, based upon Granger's unreasonable delays that constituted purposeful or reckless periods of delay, Granger forfeited its reasonable, good faith standing to seek enforcement of any nominal, limited waiver of certain damages that must be interpreted to require compliance with the covenant of good faith and fair dealing, compliance with the general contractor's duty to cooperate, compliance with the general contractor's duty not to activity interfere with the subcontractor's ability to timely complete the fixed-price subcontract, and the general contractor's affirmative obligations to use its best efforts to uphold and enforce the subcontractor's right to a time is of the essence fixed price subcontract. See Psaty & Fuhrman v. PHA, 68 A.2d 32 (R.I. 1949) (an owner's bad faith, concealment, misrepresentation or fraud voids an otherwise enforceable "no damages for delay" clause; all contracts imply "fair dealing between the parties" and impose a bar "against arbitrary or unreasonable conduct"); accord R.I. Tpk.& Bridge Auth. v. Bethlehem Steel Corp., 119 R.I. 141, 160; 379 A.2d 344, 354 (1977) (acknowledging that proof that a period of delay constituted an "unreasonable" delay could defeat an otherwise valid "no damages for delay" clause in a construction contract; the beneficiary of damage limitation provision must demonstrate that the alleged "delay" involved only "reasonable delay", not delay that was "unreasonable").

Here, Granger cannot demonstrate that the doubling of the time for performance on this time is of the essence subcontract in any way constituted "reasonable delay." Granger's doubling of the

subcontract's time is of the essence schedule constituted unreasonable delay, constituted a knowing breach, and bars enforcement of any nominal damage limitation provision.

Note that Aiello instructs that contractor's breach remedy includes "compensation for unavoidable special harm that the defendant had reason to foresee when the contract was made." Here, CEI identifies Granger's unreasonable contract breaches each of which subverted and invalidated the core bargained-for contract exchanges between CEI and Granger. Accordingly, Granger's unreasonable repudiation of its contract duties owed to CEI circumscribe and invalidate any otherwise operative AIA 4.3.10 (or other) restriction on DBR's recovery of damages. Accordingly, CEI stands entitled to recover Eichleay unabsorbed home office overhead damages that foreseeably and inevitably flowed from Granger's unreasonable period of delay. Here, Grangers's unreasonable delay and other core material breaches of contract allow CEI to recover all of its demonstrable damages, including foreseeable increased home office overhead. See Hart Eng. Water Supply Bd., 560 A.2d 329 (RI 1989) (upholding public works arbitration award of Eichleay formula unabsorbed home office delay damages).

## II. THE DEFENSE MOTION WILDLY MISREPRESENTS CONTROLLING CONTRACT LANGUAGE AND CONFIRMS CEI's ENTITLEMENT TO EXTENDED RENTAL COSTS AND LOST PROFITS ON THIS PROJECT

The defense motion unintentionally confirms that controlling contract terms allow "**anticipated profit arising directly from the Work**" and the defense motion unintentionally confirms that controlling contract terms allow recovery of subcontractor **equipment rentals** costs. Paragraph number 2 on page two of the defense motion is very misleading and is quoted below verbatim (all bold and underlining emphasis added by CEI analysis):

The General Conditions further defines consequential damages as damages for "rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons"; and "damages incurred by the subcontractor

for principal [home] office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for **loss of profit** **except anticipated profit arising directly from the Work**." See AIA Document A201, General Conditions of the Contract for Construction ("General Conditions") at §4.3.10, attached as Exhibit C [to defense motion].[3]

Agreed: CEI can collect "**anticipated profit arising directly from the Work**." Objection: The rest of the above-quoted argument from the defense motion is rather misleading. The actual full text of AIA Document A201, General Conditions §4.3.10 is quoted below verbatim:

> 4.3.10 Claims for Consequential Damages. The Contractor and Owner waive Claims against each other for consequential damages arising out of relating to this Contract. This mutual waiver includes:
>
> 1. damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and
>
> 2. damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit **except anticipated profit arising directly from the Work.**

Apparently the defense motion rests on the assumption that CEI can't read, and further assumes that CEI can't tell time, and can't do the math. Just as the AIA A-201 language contradicts the Respondents' "no Project Lost Profits" argument, so too does the ticking clock and the uncompensated doubling of the subcontract performance period prove a patent breach of CEI's "time is of the essence" fixed price subcontract.

The very last section in the defense motion (p. 5-6) contain a similarly misleading argument an is now quoted verbatim below:

[3] Again at page 4, the defense motion repeats this same highly misleading argument: "The Furthermore, the Contract General Condition expands upon this waiver and explicitly waives any and all claims to include lost profits. See, General Conditions at §4.3.10.

> "As in the case of CEI's claim for lost profits and home office overhead, CEI's claim for damages due to extended equipment use on the project must be dismissed, because the claim violates express terms of the Contract. See Contract Rider at ¶4. CEI's claim for extra equipment costs derive from the costs CEI incurred in maintaining a presence on the construction site beyond the original contract period. CEI claims $47,301 for extended tool usage, $14,674 for lifts, $5,060 for trailers, and $125 for job site telephone for a total of $67,860. Claim Summary at Item 6.
>
> "If the court finds that the terms of an agreement are clear and unambiguous... the agreement must be applied as written." W.P. Associates v. Forcier, Inc., 637 A.2d 353 (R.I. 1994); Laz-Karp Realty, Inc. v. Gilbert, 777 F.Supp. 1085 (D.R.I. 1990) ("Under Rhode Island law, clear and unambiguous language in a contract controls its interpretation and governs its legal consequences.")
>
> The Contract contains a provision that expressly limit CEI's ability to claim equipment costs. Specifically, the contract states, "This subcontractor is responsible for all supervision, layout, staging, hoisting, equipment, etc., required to effectuate this subcontractor's work." (emphasis added) Contract Rider at 4. Accordingly, CEI is responsible for the costs associated with maintaining their ability to conduct work on the job site and complete their performance.

Again the defense motion is only a house of cards. If "clear and unambiguous language in a contract controls its interpretation and governs its legal consequences", then on what basis does the defense motion pretend to ignore the clear and controlling contract language by which the parties clearly bound themselves to a time is of the essence fixed-price contract that would be completed by June 1, 2003. See Granger-CEI "time is of the essence" Subcontract, see AIA Subcontract Article 9. Attached to Defense Motion at Tab B. CEI's schedule of values as approved by Granger (see AIA Subcontract Article 4.1.3), and the CPM schedules that Granger provided to RIANG and CEI all prove that Granger promised CEI a Subcontract substantial completion date of not later than June 1, 2003 (see AIA Subcontract Article 9.3). All Subcontract and other Project documents clearly confirm that Granger stands liable to CEI for all resulting damages incurred as the result of Granger's unreasonable 360 days of project delay.

Again at page 3, the defense motion relies upon a very misleading selection of cases and statements quoted below that confuses with the "Project lost profits" claimed by CEI on this one breached subcontract versus a wide variety of wildly speculative forms of future lost profits : "Lost profits are

consequential damages and courts often use the terms interchangeably." Nevertheless, the defense motion vainly tries to confuse the fact that CEI is only seeking Project lost profits on the breached contract alone, not speculative lost profits on other future downstream projects.

The law recognizes two very different and distinct categories of lost profits, both of which, under the right circumstances are fully recoverable contract law damages. First, the law recognizes lost profits on the contract between the parties ("direct lost profits on the breached contract"). Second, the law recognizes the non-breaching party's right to recover future lost profits that allegedly would have been earned after the successful completion of the parties' contract.

One category of lost profits, direct lost profits on the breached contract pertains to the period of the contracting parties' direct dealings. On the other hand, future lost profits attempt to logically predict an alleged future stream of income that allegedly would have been generated had the parties' contract been duly performed.

A contract to build a factory if breached would allow the owner to claim that after dutiful completion of the parties' contract, the completed factory would generate a stream of new income, that offset by operating expenses, would yield some percent as future profits. Consider a breached contract to build a factory that would make a new untested product, or a contract to build a new McDonalds, or a contract to remediate an environmentally compromised tract of land that later could be profitably developed in a wildly fluctuating real estate market. Future lost profits on a future stream of income is a playground for creative lawyers with lots of variables to argue about, and easy work for sober judges and arbitrators. What are the variables, what is the historical track record, how much predictability can be demonstrated about future variables that define the expenses and profit or loss equation.

The future lost profit cases pertaining to future streams of income allegedly coming into play after the completion of the parties' contract can also be categorized: obvious future lost profits (like a loss of

future rental income in a 20-unit renovated building) or cases where the future involves too much guess work or too many variables to permit the claimant to demonstrate the legally and logically required "reasonably certain basis for calculating" the claimed future lost profit stream. While the inartful, vague term "consequential" has scores of literal and contextual meanings that vary from fact pattern to fact pattern and from state to state.

A classic old Rhode Island case with classic old Rhode Island names, Simmons v. Brown, 5 R.I. 299, 303 (1858), confirms CEI's right to Project Lost Profits in remarkably clear and penetrating terms:

> In actions for breaches of contract, the profits resulting to the plaintiff from the contract which he has entered into and which must naturally come to him if it be performed, are allowed him, as the measure of his damages, if it be broken by the defendants, and he is thereby deprived of them. In Masterton v. Mayor of Brooklyn, 7 Hill 61, which was on a contract to furnish marble for the city hall of that city, it was held, that the plaintiff was entitled to recover what he **would probably have made** if the contract had been performed, viz: the difference between the cost to him of delivering the marble, and the price which, by the contract, he was to receive. In this case, Nelson, C. J., says: "When the books speak of profits as too remote and uncertain to be taken into the account in estimating the damages, they have reference, usually, to dependent and collateral engagements entered into in faith of, and in expectation of the execution of the principal contract; but **profits, which are the direct fruit of the contract broken, stand upon a different footing. They are part of the contract itself.**" In Philadelphia, Wilmington, & Baltimore Railroad Co. v. Howard, 54 U.S. 307, 13 HOW 307, 14 L. Ed. 157, there was a similar contract. It was to furnish certain building materials for the road. Upon the breach of this contract, it was held, that in estimating the damages, the difference between the contract price and the cost price to the plaintiff, was the measure of damages; and the court say, "That **the profits were the inducement to the contract, the consideration for which the plaintiff contracted on his part, and which are lost by the breach of it by the defendant, and must be made good. The profits in this case are not only admissible in evidence, but are the measure of damages."**

In the course of two long years on Quonset Point, Granger plainly repudiated CEI's the parties' "time is of the essence" fixed-price subcontract. Recall that at the outset, the inducements that Granger offered to CEI was making a profit by completing a fixed price contract by June 1, 2003. **"The profits in this case are not only admissible in evidence, but are the measure of damages."** This misleading defense motion cannot be permitted to repudiate the core concept defining the necessary and appropriate breach of contract damage remedy that CEI must now obtain in arbitration: The right of the non-breaching

party to be "made whole" and put in the "rightful position" position CEI would have enjoyed but for Granger's material breach of contract. Granger plainly breached the parties' core bargained-for exchange and now stands liable to CEI for its resulting damages, including the profit that CEI can prove that induced it to take the contract in the first place. UST Corp. v. Gen'l Road Trucking, 783 A.2d 931 (RI 2001) (best proof of recoverable future lost profits is company's operational profit and loss history) Long v. Atlantic PBS, Inc., 681 A.2d 249, 252 (R.I. 1996) ("the bottom line should be the injured party's net **lost profits** after expenses are deducted").

## III. THE MILER ACT ASSURES CEI OF COMPLETE "MAKE WHOLE" RELIEF IN THIS ARBITRATION FOR CEI'S INCREASED COSTS OF CONTRACT PERFORMANCE

It must be noted that the defense motion affirmatively argues not only on behalf of Granger, but also affirmatively argues on behalf of the surety, purposefully confirming the surety's election of arbitration as the forum to resolve all of CEI's Miller Act claims and remedies. Indeed, all claims against the surety are fully arbitrable and fully ripe for instant arbitration. While the defense motion makes no reference to the Miller Act, CEI presents not only a breach of contract claim, but also a Miller Act bond claim that entitles CEI to recover against the surety all of CEI's unpaid actual costs of performance.

The surety has been fully joined as a party to this case. Furthermore, Rhode Island law expressly and affirmatively requires joinder of the surety in this arbitration. As confirmed by the Federal Court Order in the parties Miller Act federal action, R.I.G.L. § 10-3-1, et seq., controls. Note the following requirements of R.I.G.L. § 10-3-21, entitled " Sureties – Bound to arbitration award on construction contract' that is quoted verbatim below:

**§ 10-3-21 Sureties – Bound to arbitration award on construction contract.** – (a) If a contractor principal on a bond furnished to guarantee performance or payment on a construction contract and the claimant are parties to a written contract with a provision to submit to arbitration any controversy thereafter arising under the contract, the arbitration provisions shall apply to the surety for all disputes involving questions of the claimant's right of recovery against the surety. Either the claimant, the

contractor principal, or surety may demand arbitration in accordance with the written contract in one arbitration proceeding. The arbitration award shall decide all controversies subject to arbitration between the claimant, on the one hand, and the contractor principal and surety on the other hand, including all questions involving liability of the contractor principal and surety on the construction bond, but a claimant must file suit for recovery against the surety within the time limits set forth by law or by the terms of the bond when there are no applicable statutory provisions. The arbitration shall be in accordance with § 10-3-1 et seq. and the court shall enter judgment on the arbitration as provided in the agreement.

(b) The arbitrator or arbitrators, if more than one, shall make findings of fact as to the compliance with the requirements for recovery against the surety, and those findings of fact shall be a part of the award binding on all parties to the arbitration.

In Enviroserve, Inc. and Nat'l Union Fire Ins. Co., 301 F. Supp. 2d 56 (D.Mass. 2003), the United States District Court in Massachusetts explained the Miller Act remedies available to a subcontractor that has suffered compensable delay damages on a federal construction project covered by a posted Miller Act payment bond:

> The Miller Act "was enacted to give those supplying labor and materials for [federal] government construction contracts, protection comparable to that furnished by mechanics' and materialmen's liens where private construction is involved." Arthur N. Olive Co. v. United States ex rel. Marino, 297 F.2d 70, 72 (1st Cir. 1961); See also GE Supply v. C&G Enters., 212 F.3d 14, 17 (1st Cir. 2000)… The Act provides in pertinent part that:
>
> > Every person who has furnished labor or material in carrying out work provided fro in a contract for which a payment bond is furnished under section 3131 [formerly section 270a] of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought and may prosecute the action to final execution and judgment for the amount due.
>
> 40 U.S.C. § 3133(b)(1) (2002).
>
> A number of Circuits have recognized a subcontractor's ability to recover in quantum meruit under the Miller Act when the defendant contractor has breached the underlying contract. E.g., United States ex rel. Leno v. Summit Constr. Co., 892 F.2d 788, 792 (9th Cir. 1989); United States ex rel. C.J.C., Inc. v. W. States Mech. Contractors, 834 F.2d 1533, 1539 (10th Cir. 1987); United States ex rel. Coastal Steel Erectors, Inc. v. Algernon Blair, Inc., 479 F.2d 638, 641, (4th Cir. 1973); see United States ex rel. Lochridge-Priest, Inc. v. Con-Real Support Group, Inc., 950 F.2d 284, 286 (5th Cir. 1992). When quantum meruit is appropriate under the Miller Act recovery is not limited to the contract price, but rather the plaintiff may "recover the value of services he gave ... irrespective of whether he would have lost money on the contract and been unable to recover in a suit on the contract." W. States, 834 F.2d at 1539 (quoting Coastal Steel, 479 F.2d at 641) (alteration in original).

***

A plaintiff recovering in quantum meruit is entitled to the value of services provided. C.J.C., Inc., 834 F.2d at 1539. The defendant's argument that the value of Metric's labor has not been proven (because the plaintiff cannot show exactly when and by whom work was done) is without merit. The certified payrolls combined with Mr. Sampson's testimony are sufficient to establish the $ 36,357.00 Metric claimed for the value of its labor.

National Union makes several additional arguments concerning the labor costs claimed by the plaintiff. First, the defendant asserts that the labor claim should be reduced because some of the work performed by Metric was defective. Such a deduction would be appropriate in theory. In Miller Act cases where the plaintiff was allowed to recover in quantum meruit, costs associated with defects in the plaintiff's performance may be deducted from the value of labor and materials otherwise recoverable. See C.J.C., Inc., 834 F.2d at 1540. However, the defendant has failed to show that the amount claimed should be reduced by any amount. The defendant's own witness, Stephen Chase, who was the project engineer for the ACOE on the Project, admitted that the defects were minor and there was no showing that any of the defects experienced were unusual. Also, the defendant has failed to introduce any evidence as to the costs of rectifying the defects. I conclude, therefore, that no deduction should be made for the allegedly defective performance.

Second, the plaintiff has stated that its claimed labor costs were increased by about 20% due to work delays. The defendant contends that the claimed labor hours should be reduced by 20% to reflect the increase due to delay. I need not decide whether delay increased labor costs by 20% because again I conclude that the evidence does not support any reduction in the amount of Metric's claimed labor costs. Increased costs attributable to delay are recoverable under the Miller Act so long as the plaintiff did not create the delay. E.g., Mai Steel Serv., Inc. v. Blake Constr. Co., 981 F.2d 414, 418 (9th Cir. 1992); Lochridge-Priest, 950 F.2d at 287; United States ex rel. Pertun Constr. Co. v. Harvesters Group, Inc., 918 F.2d 915, 918 (11th Cir. 1990). [**29] Here, I find that Metric did not cause the work delays, and is therefore entitled to recovery for its increased labor costs.

Finally, Mr. Sampson testified that Metric had underbid the job by failing to include the full amount for demolition in the appropriate line item. The subcontract allotted only $ 7,500 for demolition. Based on the testimony and the evidence in record, I find that the actual value of the demolition work Metric performed to be more than the $ 7,500 allotted for demolition in the subcontract. The additional cost of this demolition work is reflected in the labor costs of Metric's claim. The defendant urges that these additional costs should be deducted because they would not have been recoverable had the contract been fully performed. I disagree. Recovery in quantum meruit under the Miller Act is appropriate where, as here, the general contractor has breached the underlying contract. See C.J.C., Inc., 834 F.2d at 1539; Coastal Steel, 479 F.2d at 641; See also United States ex rel. Ahern Co., Inc. v. J.F. White Contracting Co., 649 F.2d 29, 32 (1st Cir. 1981) (favorably citing Coastal Steel). Consequently, Metric's [**30] recovery under the Miller Act "is undiminished by any loss which would have been incurred by complete performance." Coastal Steel, 479 F.2d at 641.

In its post-trial brief, Metric for the first time argues that it neglected to include the labor costs of its project manager in its original claim and thus, an additional $ 9,892.67 should be added to bring its total claim to $ 84,505.69. The defendant, however, was not given a fair opportunity to address this argument because it was not clearly articulated until after trial, and I reject the claim for this reason. Moreover, Mr. Sampson testified that the profit figure in the original claim effectively represented his

salary for acting as project manager and electrician on the job. Since the value of his contribution has already been included in profit, it cannot now be added to increase Metric's recovery.

B. Boston Edison Costs

It is also clear that Metric's recovery on the Miller Act bond includes costs associated with the Boston Edison Transformer. Mr. Sampson testified that the building transformer at the site was unsuitable for use due to standing water. After obtaining the approval of EnviroServe, Metric rented [**31] the Boston Edison transformer to provide an alternate source of power. Although the defendant disputes these facts, I credit the testimony of Metric's witnesses on this issue. Therefore, the associated rental costs are properly included in the Miller Act claim. Metric now concedes that the actual bill for the Boston Edison transformer was only $ 7,761.70 as reflected in the invoice it entered into evidence at trial. (Pl. Prop. Find. Fact and Rul. Law at 7; Pl. Ex. 17). National Union urges that this bill should be further reduced by $ 2,500 to reflect credit received upon return of the transformer, but the defendant has produced no [*69] evidence of any such credit. Consequently, I find that Metric is entitled to recover $ 7,761.70 for the Boston Edison costs.

C. Overhead and Profit

The defendant argues that the Miller Act does not allow recovery of overhead and profit. A Miller Act claimant cannot recover overhead and profit on the unperformed portions of the underlying contract. See Arthur N. Olive Co., 297 F.2d at 72-73. Metric, however, seeks to recover overhead and profit only on the work it has already done. The First Circuit has established that a subcontractor making a claim on a Miller Act bond can recover, in addition to actual labor and material, overhead and profit, but only that which is attributable to work that has been performed. See id. ("Out-of-pocket expense is not the limit of the fair value of labor and materials.").

The defendant also urges that the plaintiff has failed to "demonstrate with reasonable certainty and specificity the overhead amount" of 15% contained in its claim. (Def. Prop. Find. Fact and Rul. Law at 9, P 5.) However, I credit the testimony of Metric's president, Mr. Sampson, on this matter, (Tr. 1 at p. 79, 1. 6 - p. 82, 1. 20), and find the claimed rates of 15% for overhead and 10% for profit to be appropriate and customary within this industry.

In summary, Metric is entitled to $ 74,181.25 for its claim on the Miller Act bond. This figure represents the full value of labor and materials requested in Metric's original claim made on May 25, 2000. The cost of the Boston Edison transformer in that claim has been reduced to reflect the plaintiff's concession as to the actual amount of the Boston Edison costs. Recovery for overhead and profit has also been allowed.

As in the above –quoted Enviroserve, Inc. case, CEI faces no limitations with respect to its statutory right to a full Miller Act recovery of all extra unpaid costs incurred by CEI in dutifully completing the contract that Granger doubled in duration without compensation. Indeed as cited in the Enviroserve case, in Mai Steel Serv., Inc. v. Blake Constr. Co., 981 F.2d 414, 418 (9th Cir. 1992), even if Granger were faultless, which is not the case, CEI still stands entitled to complete relief under the Miller Act bond:

The Miller Act does not limit a subcontractor's recovery to situations where the general contractor is at fault. Indeed, we have allowed a sub-subcontractor to recover against a Miller Act surety for labor and materials furnished to a subcontractor where the general contractor was blameless. See United States ex rel. Martin Steel Constructors, Inc. v. Avanti Constructors, Inc., 750 F.2d 759, 763 (9th Cir. 1984), cert. denied sub nom, Harvis Constr., Inc. v. United States ex rel. Martin Constructors, Inc., 474 U.S. 817, 88 L. Ed. 2d 49, 106 S. Ct. 60 (1985); United States ex rel. Hillsdale Rock Co., Inc. v. Cortelyou & Cole, Inc., 581 F.2d 239 (9th Cir. 1978) (similar). Other courts have allowed subcontractors to recover under Miller Act payment bonds for delay costs caused by the federal government. See Millers Mutual, 942 F.2d at 951 (subcontractor allowed to recover when delay resulted from government change orders); United States ex rel. Mariana v. Piracci Constr. Co., 405 F. Supp. 904, 906 (D.D.C. 1975) [**15] (subcontractor allowed to recover when delay was at least partially attributable to the federal government).

Allowing a subcontractor to recover delay costs even when the general contractor is not at fault is consistent with the overall remedial purpose of the Miller Act. The Miller Act was designed to protect subcontractors and suppliers who provide labor and materials to public projects. See, e.g., Sherman, 353 U.S. at 216. Absent an indication from Congress to the contrary, there is no sound reason to require a finding of fault on the part of the general contractor as a prerequisite for recovery under the Miller Act.

***

We conclude that when a subcontractor's claim falls within the Miller Act, the subcontractor may recover from the general contractor's Miller Act surety all of its increased labor and material costs resulting from construction delays for which it is not responsible, even if those delays are caused by someone other than the general contractor.

Respectfully submitted,

Charles S. Kirwan, Attorney At Law
Counsel to Commercial Electric, Inc.
204 King Phillip Street, Providence, RI 02909
Telephone (401) 272-6800 Fax (401) 272-6875

CERTIFICATE OF SERVICE

I, Charles S. Kirwan, hereby certify that on this 8th day of December 2005, that I sent the foregoing via telecopier to Respondent's counsel of record Mark Russo, Esquire, and Christopher Mulhearn, Esquire, FERRUCCI RUSSO P.C., 55 Pine Street, 4th Floor, Providence, RI 02903.

C130 J Maintenance Hanger and Shops, North Kingstown, Rhode Island
R.W. Granger & Sons, Inc.
Rhode Island Air National Guard Contract No. DAHA37-02-C-001

# CONTRACT MODIFICATIONS EXTENDING THE CONTRACT TIME

| MOD # | DATE | $AMOUNT | CHANGE | DAYS | COMPLETION |
|---|---|---|---|---|---|
| | | | | | NTP + 390 days |
| | | | | | 06/01/03 |
| P00005 | 01/10/03 | $(-58,662) | Govt review time re pile changes | 35 | 07/15/03 |
| P00008 | 06/12/03 | $ 13,054 | dumped snow removal + weather | 32 | 08/16/03 |
| P00010 | 08/05/03 | $139,944 | Additional wrk install Advantor security | 21 | 09/06/03 |
| P00011 | 11/18/03 | $ 63,866 | Power changes on Addendum # 6 | 42 | 10/18/03 |
| P00012 | 11/18/03 | $ 26,603 | Many changes plus time for work in Mod 11 | 47 | 12/04/03 |
| P00015 THE MERCY MOD | 01/28/04 | $ 24,838 | Conditions beyond control of the contractor weather consisting of snow, rain and wind TriState Steel Bankruptcy and holidays for Dec 03, Jan 04 and Feb 04 | 96 | 03/17/04 |
| P00016 | 03/05/04 | $ 21,855 | Revised heat detector | 16 | 04/02/04 |
| P00019 | 06/15/04 | $ 25,812 | Many changes | 29 | 05/01/04 |
| P00020 | 06/15/04 | $ 43,360 | Many changes | 30 | 05/31/04 |
| P00022 | 07/08/04 | $ 28,724 | Many changes | 53 | 07/23/04 |
| P00023 | 10/22/04 | $174,340 | Many changes ($146,000 foam) | 04 | 07/27/04 |
| | | | TOTAL | 405 DAYS | |